No. 18,220.

OPAL SMITH, ET AL. *v*. TOWN OF FOWLER.
(333 P. [2d] 1034)

Decided January 12, 1959.

Mr. ROY A. PAYTON, for plaintiffs in error.

Messrs. THULEMEYER & STEWART, Mr. A. L. FORBES, for defendant in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

THE parties are here in reverse order of their appearance in the trial court and we refer to them as they there appeared or by name.

The Town of Fowler, plaintiff below, claiming to be the owner of a tract of land described as "Lot 1 North of the River, in Section 16, Township 22 south, Range 59 west of the 6th P.M. in Otero County, Colorado," brought

this action to quiet title by complaint filed May 23, 1956. Plaintiffs in error, defendants below, appeared and contested the title of plaintiff, claiming title in themselves. Judgment and decree was for the plaintiff.

█ The plaintiff claims title through a quitclaim deed from one H. D. Rupp dated April 8, 1949, who in turn derived title by a treasurer's deed dated April 11, 1947, and recorded the same day. This treasurer's deed is not subject to attack in view of C.R.S. '53, 118-7-11. From the documents produced at the trial and admitted in evidence, it appears that the part of Section 16 in controversy, together with parcels in Section 9 adjoining it on the north, was conveyed to Anderson B. Wyatt by United States Patent dated April 20, 1874; that in 1869-1870 one Ashley, a government surveyor, meandered the south bank of the Arkansas for the purpose of establishing the north boundary of the Vigil and St. Vrain Grant and platting that part of Township 22 lying south of the river. The Vigil and St. Vrain Grant comprised a large tract of land allotted to Cornelio Vigil and Ceran St. Vrain in 1843 by the then government of Mexico. Its boundaries are described in part as " * * * one league east of the Animas river, * * * thence following in a direct line to the Arkansas River, one league below the junction of the Animas and the Arkansas, * * * and following up the Arkansas to one and one half league below the junction of the San Carlos river * * *." The Ashley survey, referred to, established a meander line along the right (southerly) bank of the Arkansas River and platted the lands lying south of that line, including most of Section 16, in lots. In 1872-73 one Hill surveyed that part of Township 22 lying north of the line established by Ashley but did not establish a meander line. He platted the lands north of and abutting the Ashley meander line in lots. The Lot 1, here in question, being a fractional part of the northwest quarter of Section 16, has always been described as being north of the Arkansas, whereas it in fact lies south of the present course of

the river or in the river bed itself, but north of the Ashley line. The patent from the United States to Wyatt describes the lands conveyed as "the North West quarter of the South West quarter and the Lots numbered four, five and six of Section nine, and the Lot numbered one of Section sixteen and the Lots numbered one and two of Section eight/ North of Arkansas River/ in Township twenty two South, of Range fifty nine West, in the district of lands subject to sale at Pueblo, Colorado Territory, containing one hundred and sixty four acres and sixty-five hundredths of an acre, according to the Official Plat of the Survey of the said Lands, returned to the General Land Office * * *." The official plat (Plaintiff's Exhibit J) referred to in the patent is the Hill survey which shows the south boundary of Lot 1, Section 16, to be the Ashley meander line. The words "North of Arkansas River" appear on the patent as an interlineation.

In 1949, after acquiring title from Rupp by quitclaim deed, the Town of Fowler took possession of the land, constructed a sewer line across a part of Lot 1, and has remained in possession since that time.

The defendants are the record owners of Lots 3 and 4 of Section 16 and Lot 2 in Section 9, South of the Arkansas River, in Township 22, patented February 4, 1897, to Martin L. Smith, the father of defendants. Lot 4, south of the river adjoins Lot 1 north of the river on the north and west. The defendants claim title to Lot 1 north of the river on two grounds; viz., by accretion, and by adverse possession for more than eighteen years. They assert that the north boundary of their Lot 4 is the Arkansas River, and as the river moved northward through the years Lot 1 was entirely absorbed by the process of accretion, the movement of the river having extended the north boundary of their Lot 4 to the thread of the stream as it now exists. They also claim title by adverse possession for more than the required statutory period, asserting that after the disastrous flood of 1921

all boundary fences had disappeared and they thereafter pastured cattle on the land in question. They attack the title of the plaintiff as being based upon a void tax deed and much of their belief is devoted to that question.

The trial court rejected the claims of defendants on all counts and entered a decree quieting title to the property involved in the Town of Fowler. Defendants are here on writ of error seeking reversal.

■ First, considering defendants' claim of title by accretion. The general rule, urged by defendants and recognized by all the authorities, is that the proprietor of lands bounded upon a non-navigable stream is benefited, or his holdings impaired, by changes in the course of the stream occurring gradually over a period of time, and where the stream is designated as a boundary the grant extends to the thread of the stream. In *Hanlon v. Hobson* (1897), 24 Colo. 284, 51 Pac. 433, in considering the application of the rule, the court observed:

"The only question * * * upon this branch of the case is what effect is to be given to the descriptive words of these deeds. * * * the language, in so far as pertinent here, is as follows: 'thence south to the Arkansas river; thence up said river to where it is intersected by the south line of the town.' Under the authorities which we have examined, and as we think must be so in a case, where, as here, in a deed conveying lands a non-navigable river itself is named as a monument, the grant extends to its center, and the thread of the stream is its true boundary."

■ Where the words "along," "to" or "bounded by" a water course, or similar expressions are used to describe a grant, the rule is generally held to apply, unless a contrary intention of the parties appears. See Thompson, Real Property, Vol. 6, page 658.

In the case before us the patent, under which defendants derive their title to Lots 3 and 4 of Section 16, south of the Arkansas River, *according to the Official Plat*

*thereof returned to the General Land Office,* when considered in the light of surrounding circumstances, shows the boundaries of the land conveyed to be not the Arkansas River but the Ashley meander line along the south bank of that river. It is definitely tied to the Hill survey platting lands to the north of that line and pursuant to which the Wyatt patent was issued more than twenty years before. According to the "official plat thereof" as returned to the General Land Office, the north boundary of defendants' Lot 4 is the south boundary of plaintiff's Lot 1. As lending support to this conclusion, the instructions of the Commissioner of the Department of the Interior to the Surveyor General at Denver direct him as follows:

"In transmitting corrective plats you will represent the surface of the river, which is innavigable as part of public land in the computation of fractional tracts made so by the meanders of the right bank of Arkansas river." Plaintiff's Exhibit F.

■ Where a conveyance is made with reference to an official map or plat, the map or plat becomes a part of the grant. Thus in the case of *Wisconsin Realty Co. v. Lull* (1922), 177 Wis. 53, 187 N.W. 978, the Supreme Court of Wisconsin considered a very similar situation to that before us. There, as here, the government survey meandered a river and platted fractional lots in conformity with such line. The description in the conveyance involved read as follows: "Lot 1 in section 21, being all the land in said section north of the Flambeau river and containing 65.48 acres more or less according to the United States government survey." A subsequent survey showed the river to be a considerable distance south of that shown on the official plat. It was therefore claimed that all of the land in Section 21 lying north of the Flambeau River as it actually existed belonged to the grantee. In resolving the question before it the Wisconsin court said:

"A construction of the entire conveyance satisfies us

that the meander lines as designated on the plat and in the original field-notes must be held to be the actual boundary of the land conveyed, for the following reasons:

"The conveyance contains an express reference to this particular governmental survey;

"It contains an express reference to a particular lot platted and represented on such survey;

"It contains a specific designation as to the acreage contained.

"The difference between the designated acreage in the conveyance of 65.48 acres claimed, and the 160 acres claimed if the boundary should be limited by the two quarter-lines, or the 173 acres if to the actual river, is in either event so grossly excessive as to indicate, in connection with the purchase price, that neither of the larger quantities could have been within the intention of the parties.

"Express reference to the United States government survey makes the plat as recorded in pursuance to the field-notes, if not a substantial part of the deed, at least an appropriate source of reference in so ascertaining the real intention."

As shown by the official plat all of the area of Lot 1 in Section 16 at the time of the Hill survey in 1873 was either in the river bed or south of the north bank of the river, hence the reference in the Wyatt patent to it being north of the river had no basis in fact, and could not have been intended to mean more than that it was to be distinguished from a fractional lot of the same number in the same section which lay to the south of the Ashley line. Nothing in either of the patents involved refers to the river as a boundary.

As said in *City of Denver v. Pearce* (1889), 13 Colo. 383, 22 Pac. 774:

"The presumption, based upon the language of the description, upon which appellee relies, must be deemed to be overcome by the proof of circumstances inconsist-

ent with it, within the meaning of the authorities cited. The westerly boundary of appellee's land must therefore be held to be the easterly bank of Cherry Creek, as defined by the Ebert survey, and not the thread of the stream."

It is undisputed that the Arkansas River has run in its present channel since 1900, and probably before that time, although no witness was able to testify to conditions before that year. It is also undisputed that as late as 1916 the then record owners of Lot 1 planted and harvested crops thereon and a fence separated the property from that of defendants. In the flood of 1921 this, with other fences, was destroyed, and according to the findings of the trial court based upon conflicting testimony, was rebuilt by defendants. Any accretion that occurred had taken place long before 1916 and probably before 1900, yet the defendants made no claim thereto at that time, or at any time before or since, until their appearance in this case. Their silence and acquiescence in the *status quo* over a period of nearly sixty years strongly refutes any intention to make such claim.

The general rule is that meander lines are not run as boundary lines of the lands surveyed. They are usually run to determine the outlines of the stream or other body of water and as a means of ascertaining the quantity of land embraced in the survey. This rule is subject, however, to many exceptions. One such exception applies where the parties to the instrument of conveyance intended to use the meander line; another where public officers in making sales have actually or by necessary implication made the meander line the boundary line. See 11 C.J.S. 574-575, Sec. 30.

We now recognize the above two exceptions to the general rule. And, where either or both of them apply, as both do here, the law of accretion cannot come into being.

Defendants' claim of title by adverse possession appears to be based chiefly upon the fact that in the flood

of 1921 all fences separating Lot 1 and Lot 4 were washed away and were not re-established, except along the highway on the west section line of Section 16, from the river to the quarter corner. This re-establishment is said to have occurred in 1922 or 1923, and thereafter cattle, some of which belonged to the defendants or their tenants, were pastured on Lot 1 from time to time. Other than this, nothing was done to reduce the property to possession or assert ownership thereof.

In *Lovejoy v. School District* (1954), 129 Colo. 306, 269 P. (2d) 1067, it was held that:

"The very essence of adverse possession is that the possession must be hostile, not only against the true owner, but against the world as well. An adverse claim must be hostile at its inception, because, if the original entry is not openly hostile or adverse, it does not become so, and the statute does not begin to run as against a rightful owner until the adverse claimant disavows the idea of holding for, or in subservience to another, it actually sets up an exclusive right in himself by some clear, positive and unequivocal act."

■ The mere erasure of a common boundary fence in a flood disaster does not clothe an adjoining owner with possession of lands adversely to his neighbor. No actual effort was made by these defendants to reduce the disputed land to their possession. No clear, positive or unequivocal act of ownership characterizes their conduct. The pasturage of cattle on unfenced land cannot be regarded as hostile and adverse to the owner of such land. It is a matter of common knowledge that cattle will invade any unfenced land in search of grass or water. No effort was made by defendants to have the property involved assessed to them, and so far as the record shows they have never attempted to pay any taxes thereon.

The facts and circumstances as shown by the record, and as the trial court held, fall far short of establishing any title in defendants.

Finding no error in the record, the judgment is affirmed.