## No. 20777.

The Twin Lakes Reservoir and Canal Company,
The Connecticut Mutual Life Insurance Company
and The Colorado National Bank of Denver *v.*
Eugene A. Bond.
(401 P.2d 586)

Decided April 5, 1965. Rehearing denied May 17, 1965.

THULEMEYER & STEWART, YEGGE, HALL and SHULEN-BURG, for plaintiffs in error.

W. DAVID McCLAIN, EUGENE A. BOND, for defendant in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

WE will refer to The Twin Lakes Reservoir and Canal Company as Twin Lakes in those instances in which the reference is to the company as distinguished from the other plaintiffs in error. Where all plaintiffs in error are equally affected they will be referred to as the defendants. The defendant in error will be referred to as the plaintiff or as Bond.

The action was commenced in the trial court by Bond who sought to partition certain real estate in eight sections of land in Lake County, Colorado. The case involves a substantial acreage lying under two natural lakes commonly known as Twin Lakes. It also involves other lands not bordering upon or in any way connected with the water in the lakes or the stream which empties into and flows out of them.

The water level of the two lakes was raised from time to time by the erection of a dam at or near the outlet of the lakes. Exclusive and perpetual easements for the storage of water were acquired over a period of many years by the predecessors of Twin Lakes, and also by Twin Lakes itself. These easements began at the meander line of the shores of the two lakes originally fixed as the "12 foot contour line." They covered the area from this line outward to the 23 foot contour line, then further to the 30 foot line and ultimately to a 40 foot contour line.

Twin Lakes and Bond are the owners of the property in dispute, as tenants in common, each interest being an undivided one-half of the whole. The title of the parties stems, in major part, from patents from the United States, and to a lesser area from selection by the State of Colorado pursuant to the Enabling Act and subsequent patents from the state. All the patents, whether from the federal government or the state, were issued with reference to an official government survey of Township 11. This survey was admitted in evidence and shows both the upper and lower lakes involved in this controversy. The survey became official by approval of the Surveyor General on March 31, 1877. Both the upper and lower lakes are irregular in shape, by which we mean that they cannot be described as being round, square, triangular or oval in general characteristics. The land abutting the lakes was platted and surveyed to the boundary of the lakes, and the meander lines of the lakes marked the inner boundaries of the numerous lots shown by the plat.

The surveyor used lot numbers to identify the separate tracts.

The trial court, in ordering partition in kind of the lands involved in the action, found as follows:

"Twin Lakes was originally two natural bodies of water collectively described as Twin Lakes and sometimes referred to as the upper and lower lakes. The cotenancy property extends into and upon the bed and floor of Twin Lakes from the meander line thereof on the lots and subdivisions abutting Twin Lakes, as the same were originally surveyed, mapped and designated by and for the United States and as approved by the Surveyor General under date of March 31, 1877, and of record in his office and in evidence in this cause as Defendants' Exhibit No. 6; and said property includes such areas of the bed and floor of said Twin Lakes from said meander line to the center or thread of Twin Lakes."

As a factual basis for that finding the trial court found:

"The original patents from the United States and the State of Colorado and the selection lists of said State contained no reservation of the rights or title of or to the United States or of or to the State of Colorado in or to the area extending into Twin Lakes beyond the meander line of Twin Lakes as surveyed as aforesaid, nor did the United States or the State of Colorado use said meander line as a boundary line of the tracts conveyed in and by said patents. It does not appear that the United States or the State of Colorado intended to use the original meander line as a boundary line of the lands patented; nor does it appear that the public officers, in making sales, did actually or by necessary implication make the meander line the boundary line in said patents. Under such circumstances, the general rule that the meander line is not the boundary line applies and under that rule, the patentees obtained title from the meander line on the various lots and tracts abutting Twin Lakes to the center of Twin Lakes."

Question to be Determined.

*Did the trial court err in decreeing that the plaintiff Bond and the defendant Twin Lakes were cotenants and joint owners of the lands to the center or thread of Twin Lakes, and in ordering a partition of the property?*

■ The question is answered in the affirmative. We are well aware of the majority rule that where land is conveyed to the shore line of or along the line of a running stream, the grantee receives the fee title to the center thereof. It must not be overlooked, however, that most of those decisions are from states which recognize the doctrine of riparian ownership. We are also not unmindful of those early Colorado cases of *Hanlon v. Hobson,* 24 Colo. 284, 51 Pac. 433, and *Hartman v. Tresise,* 36 Colo. 146, 84 Pac. 685, which adhered to the general rule that when the tract of land granted is described as bounded by a nonnavigable stream, the middle or thread of the stream is the true boundary, unless the conveyance contains an express or implied reservation of the stream, or words limiting the boundaries to the bank.

The official map of the original government survey shows that every tract of land bordering on each of the lakes is shown by a lot number within certain sections. Each of these lots is of an irregular acreage of less than a full forty acres which is the usual surveyor's way of identifying lands within any given section. On each of these lots the acreage contained therein appears on the map.

The fallacy of the trial court's conclusion may be illustrated by reference to Exhibits 23 and 26. Exhibit 23 is a patent issued to one Moses Bruner. It conveys four separate lots, as numbered on the map, which border on the original meander line of the *west end of the upper Twin Lake,* and which were located in Section 19. Each of the lots is described on the map as containing fractional acreages. Exhibit 26 is a certified copy of a patent issued to Zeriah Smith. Part of the land therein con-

veyed is a lot which borders on the meander line of the *south shore* of the upper Twin Lake. As in all other instances where lots are shown on the official map, the irregular acreage is portrayed. If the lots to the west of upper Twin Lake convey to the middle of the lake, then the description of the lots coming in at right angles from the south would be a conveyance to the middle of the lake. It is obvious to anyone who may look at the official map that if the trial court's conclusion is correct the ground under water would be conveyed to at least two different persons. This situation prevails all around both lakes, and the construction placed upon the patents by the trial court creates a hopeless conflict of ownership arising from patents issued to separate grantees all around the Twin Lakes.

It is not to be presumed that the government officials created any such havoc by the various patents all around the Twin Lakes. That the government itself did not so construe those patents is evident from its action in accepting the application of the predecessors of Twin Lakes for storage rights, and when, in 1923, it later certified that the rights of Twin Lakes to store water had been earned.

 The admitted fact that the United States and the State of Colorado granted storage rights to Twin Lakes and its predecessors for the storage of water in the upper and lower lakes disproves the conclusion that they had parted with title "to the center of the lake" when they issued patents to lots showing the meander line as a boundary. In *Smith v. Town of Fowler*, 138 Colo. 359, 333 P.2d 1034, this court re-affirmed the middle of the stream rule by holding that where the words, "along," "to," or "bounded by" a water course are used to describe a grant of land, the grant extends to the thread of the stream, unless a contrary intention of the parties appears; but that where a conveyance is made with reference to an official map or plat, the map or plat becomes a part of the grant, or a source of reference in

ascertaining the real intention of the parties. In that case this court said:

"Where a conveyance is made with reference to an official map or plat, the map or plat becomes a part of the grant. Thus in the case of *Wisconsin Realty Co. v. Lull* (1922), 177 Wis. 53, 187 N.W. 978, the Supreme Court of Wisconsin considered a very similar situation to that before us. There, as here, the government survey meandered a river and platted fractional lots in conformity with such line. The description in the conveyance involved read as follows: 'Lot 1 in section 21, being all the land in said section north of the Flambeau river and containing 65.48 acres more or less according to the United States government survey.' A subsequent survey showed the river to be a considerable distance south of that shown on the official plat. It was therefore claimed that all of the land in Section 21 lying north of the Flambeau River as it actually existed belonged to the grantee. In resolving the question before it the Wisconsin court said:

" 'A construction of the entire conveyance satisfies us that the meander lines as designated on the plat and in the original field notes must be held to be the actual boundary of the land conveyed, for the following reasons:

" 'The conveyance contains an express reference to this particular governmental survey;

" 'It contains an express reference to a particular lot platted and represented on such survey;

" 'It contains a specific designation as to the acreage contained.

" 'The difference between the designated acreage in the conveyance of 65.48 acres claimed, and the 160 acres claimed if the boundary should be limited by the two quarter-lines, or the 173 acres if to the actual river, is in either event so grossly excessive as to indicate, in connection with the purchase price, that neither of the larger quantities could have been within the intention of the parties.

" 'Express reference to the United States government survey makes the plat as recorded in pursuance to the field notes, if not a substantial part of the deed, at least an appropriate source of reference in so ascertaining the real intention.' "

In the instant case the government survey meandered two lakes and platted fractional lots on all sides of those lakes and in between the lakes. Each lot shown on the survey designates and discloses the acreage contained therein. The patents to the lands bordering on and all the way around and between both of the Twin Lakes refer to the land and convey the same by lot numbers according to the official survey, and in every case the lot as numbered on the survey discloses the acreage of each lot. The difference between the acreage as shown on the lots and the acreages claimed by Bond are very material. The increase in acreage, if ownership is carried to the center of the lake or to the "thread of the stream," is so great as to negate the claim.

From the date of the original patents, subsequent owners of the property described therein have granted easements for storage of additional water to Twin Lakes, and invariably started or ended the description of the land over which the easements were granted at the original high water meander line of the natural lakes. This significant fact indicates clearly that at the time of the granting of those easements the grantor did not claim ownership of the bottom of the lake to the center thereof, or to the "thread of the stream." For over sixty years no grantee in any patent, nor any successor in interest, claimed ownership to any portion of the land under the water of the lakes.

The United States, after executing patents to individual owners as above outlined, granted to Twin Lakes or its predecessors the right to use that land for the storage of water as did also the State of Colorado by virtue of other filings made with the state engineer. If those rights of storage were inconsistent with or con-

trary to the rights of the patentees, it behooved them to take some action to protect their rights.

We pass now to consideration of another important phase of this controversy. In 1950 Bond brought an action against Twin Lakes claiming damages for trespass by the over-flowing of water on the land area between the 23 foot contour and the 28.65 foot contour levels. Bond also sought injunctive relief. Before final disposition was made by the court in that action, it was dismissed (July 28, 1951) on stipulation of the parties. The dismissal was with prejudice.

■ The agreements upon which the stipulation for dismissal of that action was based were generally as follows: Bond conveyed an easement to Twin Lakes on parts of the land involved in that litigation for the storage of water. He received as consideration the sum of $25,000 which ostensibly put an end to the dispute raised in the pending case. In addition to ending that dispute, and as the inducing cause thereof, Twin Lakes and Bond entered into a series of transactions whereby they defined new rights and interests in the entire tract of property held by them as cotenants. They expressly provided by separate agreement that the series of transactions was intended to "compromise and settle their differences arising out of the joint ownership of the property." By these documents Bond not only received the $25,000 but acquired most of the interest in land which Twin Lakes owned in the Village of Twin Lakes for the stated consideration of $100.00. Twin Lakes gave Bond a lease on its interest in the remainder of all the property involved herein. The term of that lease was for 20 years. In that lease Bond agreed that Twin Lakes could use or sell to a government agency, at any time during the term of the lease, all of the Company's interest in property lying below the 40 foot contour level. The term of the lease was to expire July 7, 1971. Any meaningful construction of the word "beneath" as therein used could only mean the area between the 40 foot

contour line and the meander line of the original Twin Lakes. A partition in kind of the property as ordered by the trial court would defeat entirely the right of Twin Lakes to sell and to use that property "at any time during the term of the lease" executed by Bond. An agreement made by cotenants not to partition may arise by implication, and where a contract between them cannot be carried out in event of partition, then a cotenant has no right of partition.

In *McIntire v. Midwest Theatres Company*, 88 Colo. 559, 298 Pac. 959, there was a lease on a building, owned as cotenants by McIntire and Midwest Theatres Company, under which the company leased the interest of McIntire. The company sought partition. In that case this court said:

"Counsel for McIntire say that the company is, by its 1924 contract, estopped to demand partition, and that the court was without power to enter such a decree. On the first proposition they cite 47 C. J., page 321, sections 130 to 132, and on the second the same volume, page 482, section 532, and page 613, section 932. They further insist that partition is, under the circumstances here disclosed, contrary to equity and good conscience.

"The company stands upon the general rule that a tenant in common is entitled to partition; says the answer is a plea in abatement until the expiration of the lease; and cites section 5149, C.L. 1921, prohibiting that plea in a partition suit.

"The usual rule is as stated by the company. The sole question here is its applicability. Whatever may be said of the authorities cited, the simple fact is that there is nothing inalienable about this right of partition. A tenant in common may contract it away and this company has unquestionably done so. It agreed to pay McIntire $265 a month until May 1, 1932. It secured those payments by a mortgage on the leased premises. It now seeks, by the simple expedient of partition, to release that mortgage and evade those payments, unless Mc-

Intire purchases at the sale. Of course it cannot thus escape its obligation or force McIntire into additional expenditures to protect his contract."

■■ In *Arnold v. Arnold,* 308 Ill. 365, 139 N.E. 592, the Supreme Court of Illinois has this to say of a similar situation:

"It has been said in general terms that an adult tenant in common has an absolute right to partition (citing authority); but it has been in cases where there was neither an equitable nor legal objection to the exercise of the right, and partition was in accordance with the principles governing courts of equity. Wherever any interest inconsistent with partition has been involved, the general rule has always been qualified by the statement that equity will not award partition at the suit of one in violation of his own agreement, or in violation of a condition or restriction imposed upon the estate by one from whom he claims, or where partition would be contrary to equitable principles. Partition will not be awarded in a court of equity, where there has been an agreement either not to partition, or where the agreement is such that it is necessary to secure the fulfillment of the agreement that there should not be a partition. Such an agreement may be verbal, if it has been acted upon, and it need not be expressed, but will be readily implied, and enforced, if necessary to the protection of the parties. Martin v. Martin, 170 Ill. 639, 48 N.E. 924, 62 Am. St. Rep. 411; Bissell v. Peirce, 184 Ill. 60, 56 N.E. 374; Ingraham v. Mariner, 194 Ill. 269, 62 N.E. 609; Seals v. Treatch, 282 Ill. 167, 118 N.E. 422; Hill v. Reno, *supra.*"

■ In *Carolina Mineral Company v. Young,* 220 N.C. 287, 17 S.E.2d 119, the rule of estoppel by implied agreement arising from an existing lease between the cotenants was recognized and applied. *McIntire v. Midwest Theatres Company, supra,* was discussed at length and the rule there applied was approved. This court has repeatedly recognized the doctrine of estoppel in pais,

even to the point of decreeing that it may effect a waiver of statutory and constitutional rights.

■ In *Johnson v. Neel,* 123 Colo. 377, 229 P.2d 939, with reference to the doctrine of estoppel in pais, this court said:

"We are of the opinion that under the peculiar facts of this case the doctrine of estoppel in pais is applicable and controlling. This doctrine is founded upon principles of fair dealing and is designed to aid the law in the administration of justice where, without its aid, injustice might result. In 19 American Jurisprudence, page 640, we find the following statement: 'Generally speaking, however, equitable estoppel is a rule of justice which in its proper field prevails over all other rules.' The doctrine of equitable estoppel has been invoked to cut off rights or privileges conferred by statute, and constitutional rights may be effectively waived by conduct consisting of action or failure to act. *Munsell v. People,* 122 Colo. 420, 222 P.2d 615; *Kalloch v. Elward,* 118 Me. 346, 108 Atl. 256, 8 A.L.R. 750; *Wilson v. Philadelphia School District,* 328 Penn. 225, 195 Atl. 90, 113 A.L.R. 1401. 'A statute cannot stand in the way of waiver or equitable estoppel when the facts demand their application in the interest of justice and right.' *Kalloch v. Elward, supra.*"

See also *Sanger v. Larson Construction Co.,* 126 Colo. 479, 251 P.2d 930; *Piz v. Housing Authority,* 132 Colo. 457, 289 P.2d 905; *Mabray v. Williams,* 132 Colo. 523, 291 P.2d 677.

■ In the case at bar Twin Lakes parted with a substantial cash consideration and other of its properties for an exclusive and perpetual easement from the 30 foot contour line, with the assurance of Bond that during the period of the lease it would not be deprived of an easement from the 40 foot contour towards the original Twin Lakes meander line. Twin Lakes was further granted the right of sale or lease of all these rights to a government agency up to the date of the expiration

of the lease in 1971. The full enjoyment by Twin Lakes of these contractual rights cannot be minimized or defeated by partition. In 68 C.J.S., Partition § 44, we note the following cogent language:

"The general rule is well settled that partition will not be granted at the suit of one in violation of his own agreement, since the agreement operates as an estoppel against the right to partition. An agreement within the operation of this rule may be oral where it has been so far performed that to allow its repudiation would be tantamount to allowing the commission of a fraud, but not otherwise. The agreement not to partition may be implied as well as express; and will be readily implied and enforced if such implication proves necessary to secure a fulfillment of an agreement between the co-tenants, or if the granting of partition would destroy the estate sought to be partitioned. * * *"

In *Nagel v. Kitchen,* 381 Ill. 178, 44 N.E.2d 853, we find the following pertinent language:

"Defendants contend that since plaintiff joined in the execution of the leases covering these various properties it amounted to an implied agreement not to partition the lands during the period of the leases. An agreement not to partition need not be expressed and may be implied. It is settled law that if it appears the tenants in common of a tract of land have formulated plans and entered into agreements in reference to the management of the common property and the plans and agreements are of such a character that to grant partition would be to destroy the mutual agreement of the parties, then an agreement not to partition will be implied. *Whitaker v. Scherrer,* 313 Ill. 473, 145 N.E. 177. * * *"

By the terms of a lease executed by the Company and Bond as part of the July 7, 1951 compromise, Bond was given full and exclusive possession of all the lands owned in common by the two of them for 20 years for a nominal consideration of $10.00, subject only to the easements conveyed to the Company for reservoir pur-

poses. That this lease to Bond was of considerable value is evidenced by the fact that he has since assigned that lease to others for a rental of $3,000.00 per annum. There was ample consideration for Bond's agreement. Partition in kind now would destroy that right, and Twin Lakes would have something different to sell than that for which it had contracted with Bond. Partition by sale would force Twin Lakes to purchase back those rights in event of sale. The condition of the title with the lease thereon would seriously impede the procurance of competitive bidding in the event of partition by sale.

It follows from the foregoing that the judgment of the trial court, decreeing a partition of the property in dispute, was erroneous, and it accordingly is reversed.

MR. JUSTICE SCHAUER not participating.