Eugene LOBATO; Zack Bernal; Gabrielita Adeline Espinosa; Edward Espinosa; Pete E. Espinosa, Jr.; Corpus Gallegos, by and through his conservator Yvette Gallegos; Gloria Gallegos; Rupert Gallegos; Raymond Garcia; Charlie Jacquez, Jr.; Adolph J. Lobato; Bonifacio "Bonnie" Lobato, by and through his Conservator Teresa Lobato; Carlos Lobato; Emilio Lobato, Jr.; Jose F. Lobato; Presesentacion J. Lobato; Gloria Maestas; Norman Maestas; Robert "Bobby" Maestas; Raymond J. Maestas; Eugene Martinez; Mark Martinez; Agatha Medina; Gilbert "Andres" Montoya; Shirley Romero Otero; Eppie Quintana; Lucille Samelko; Arnold Valdez; Ervin L. Vigil; Larry J. Vigil; Michael J. Vigil; Billy Alire; Robert Atencio; Frances D. Berggran–Buhrles; Jose Fred Carson; Elmer Manuel Espinosa; Margurito Espinosa; Moises Gallegos; Ruben Gallegos; Richard J. Garcia; Manuel Gardunio; Ruben Herrara; Jeffrey Jacquez; Adelmo Kaber; Crucito Maes; Daniel Martinez; David Martinez; Jesse Martinez; Leonardo Martinez; Rosendo Martinez; Solestiano Martinez; Alfonso Medina; Gilbert Medina; Leandardo Medina; Loyola Medina; Marvin Medina; Orry Medina; Raymond N. Medina; Rudy Montoya; Gurtrude C. Olivas; Eppy Wayne Quintana; Robert Romero; Shirley Romero; Anthony Sanchez; Bonnie Sanchez; Eugene Sanchez; Evan Sanchez; James Sanchez; Jose G. Sanchez; Rufino Sanchez; S.R. Sanchez; Vernon Sanchez; Ronald A. Sandoval; Elesam Santistevan; Daniel Segura; Floyd R. Solan; Carolyn Taylor; Sam Valdez; Martha Vialpondo; Joe P. Vigil; And Walter Vigil, Petitioners.

v.

Zachary TAYLOR, as executor of the Estate of Jack T. Taylor, Jr., deceased; the Taylor Family Partnership; J. Hoy Anderson; Marvin Lavern Stohs; Edythe Kelly Stohs; Charles W. Gelderman; William F. Phinney; Harlan A. Brown; Dena F. Fuhrmann; Jimmy C. Crook; Freeland D. Crumley; Joseph P. Campisi; Hugh R. Denton; Robert Paul Resteli; Eugene J. Kafka; Avis M. Anderson; Clifford R. Jenson; Don W. Jacobs; Raymond E. Gauthier; Francis P. Heston; and Howard G. Frailey, Respondents.

No. 00SC527.

Supreme Court of Colorado,
En Banc.

June 24, 2002.

Eley, Goldstein and Dodge, LLC, Jeffrey A. Goldstein, Otten, Johnson, Robinson, Neff & Ragonetti, PC, William F. Schoeberlein, Robert Maes, David Martinez, Walters & Joyce, PC, Julia T. Waggener, Kelly, Haglund, Garnsey & Kahn LLC, Norman D. Haglund, Don Hiller & Galleher, PC, Watson Galleher, Elisabeth Arenales, Denver, CO, Attorneys for Petitioners.

Wolf & Slatkin, PC, Albert B. Wolf, Raymond P. Micklewright, Jonathan L. Madison, Denver, CO, Attorneys for Respondent.

Richard Garcia, Denver, CO, Peter Reich, Costa Mesa, CA, Attorneys for Amici Curiae Bi–National Human Rights Commission, International Indian Treaty Council, National Chicano Human Rights Council, Comision De Derechos Humanos De Seminario Permanente De Estudios Chicanos Y De Fronteras.

Federico Cheever, Gorsuch Kirgis, LLP, Loretta P. Martinez, Denver, CO, Attorneys for Amicus Curiae Colorado Hispanic Bar Association.

David J. Stephenson, Jr., Denver, CO, Attorney for Amicus Curiae Rocky Mountain Human Rights Law Group.

Chief Justice MULLARKEY delivered the Opinion of the Court.

The history of this property rights controversy began before Colorado's statehood, at a time when southern Colorado was part of Mexico; at a time when all of the parties' lands were part of the one million acre Sangre de Cristo grant, an 1844 Mexican land grant. Here, we determine access rights of the owners of farmlands in Costilla County to a mountainous parcel of land now known as the Taylor Ranch. As successors in title to the original settlers in the region, the landowners exercised rights to enter and use the Taylor Ranch property for over one hundred years until Jack Taylor fenced the land in 1960 and forcibly excluded them. These rights, they assert, derive from Mexican law, prescription, and an express or implied grant, and were impermissibly denied when the mountain land was fenced.

We are reviewing this case for the second time in this protracted twenty-one year litigation. In the first phase of this litigation, the trial court dismissed the plaintiffs' claims, holding that a federal decision in the 1960s on the same issue barred their suit. We reversed and remanded, holding that the notice given in the federal case did not comport with due process. The subject matter of the current appeal is the landowners' substantive claims of rights. The trial court and the court of appeals held that the landowners failed to prove rights on any of their three theories.

We find that evidence of traditional settlement practices, repeated references to settlement rights in documents associated with the Sangre de Cristo grant, the one hundred year history of the landowners' use of the Taylor Ranch, and other evidence of necessity, reliance, and intention support a finding of implied rights in this case. While we reject the landowners' claims for hunting,

fishing, and recreation rights, we find that the landowners have rights of access for grazing, firewood, and timber through a prescriptive easement, an easement by estoppel, and an easement from prior use. Furthermore, we retain jurisdiction in order to examine the trial court's due process determination.

## I. Facts and Prior Proceedings

In 1844, the governor of New Mexico granted two Mexican nationals a one million-acre land grant, located mainly in present-day southern Colorado (Sangre de Cristo grant), for the purpose of settlement. The original grantees died during the war between the United States and Mexico. The land was not settled in earnest until after the cessation of the war, and Charles (Carlos) Beaubien then owned the grant.

In 1848, the United States and Mexico entered into the Treaty of Guadalupe Hidalgo, ending the war between the two countries. Treaty of Peace, Friendship, Limits, and Settlement (Treaty of Guadalupe Hidalgo), February 2, 1848, U.S.–Mex., 9 Stat. 922. Pursuant to the treaty, Mexico ceded land to the United States, including all of California, Nevada, and Utah; most of New Mexico and Arizona; and a portion of Colorado. The United States agreed to honor the existing property rights in the ceded territory. Relevant to the Sangre de Cristo grant, Congress asked the Surveyor General of the Territory of New Mexico to determine what property rights existed at the time of the treaty. On the Surveyor General's recommendation, Congress confirmed Carlos Beaubien's claim to the Sangre de Cristo grant in the 1860 Act of Confirmation. 12 Stat. 71 (1860).

In the early 1850s, Beaubien successfully recruited farm families to settle the Colorado portion of the Sangre de Cristo grant. He leased a portion of his land to the United States government to be used to establish Fort Massachusetts and recruited farmers to settle other areas. The settlement system he employed was common to Spain and Mexico: strips of arable land called vara strips were allotted to families for farming, and areas not open for cultivation were available for common use. These common areas were used for grazing and recreation and as a source for timber, firewood, fish, and game.

In 1863, Beaubien gave established settlers deeds to their vara strips. That same year, Beaubien executed and recorded a Spanish language document that purports to grant rights of access to common lands to settlers on the Sangre de Cristo grant (Beaubien Document). In relevant part, this document guarantees that "all the inhabitants will have enjoyment of benefits of pastures, water, firewood and timber, always taking care that one does not injure another."

A year later, Beaubien died. Pursuant to a prior oral agreement, his heirs sold his interest in the Sangre de Cristo grant to William Gilpin, who was Colorado's first territorial governor. The sales agreement (Gilpin agreement) stated that Gilpin agreed to provide vara strip deeds to settlers who had not yet received them. The agreement further stated that Gilpin took the land on condition that certain "settlement rights before then conceded ... to the residents of the settlements ... shall be confirmed by said William Gilpin as made by him."

In 1960, Jack Taylor, a North Carolina lumberman, purchased roughly 77,000 acres of the Sangre de Cristo grant (mountain tract) from a successor in interest to William Gilpin. Taylor's deed indicated that he took the land subject to "claims of the local people by prescription or otherwise to right to pasture, wood, and lumber and so-called settlement rights in, to, and upon said land."

Despite the language in Taylor's deed, he denied the local landowners access to his land and began to fence the property. Taylor then filed a Torrens title action in the United States District Court for the District of Colorado to perfect his title (Torrens action).[1] *Taylor v. Jaquez*, No. 6904 (D.Colo.

---

1. The Colorado Torrens Title Registration Act allowed land owners to file an action that would essentially quiet title to their land. §§ 118–10–1 to –102, 5 C.R.S. (1952)(now codified at §§ 38–36–101 to –199)(for a full discussion of the Tor-

rens Title Registration Act, *see Rael v. Taylor*, 876 P.2d 1210, 1219–23 (Colo.1994)). Because Taylor was a North Carolina resident he invoked diversity jurisdiction.

Oct. 5, 1965). The district court found that the local landowners did not have any rights to the mountain tract; the Tenth Circuit Court of Appeals affirmed. *Sanchez v. Taylor*, 377 F.2d 733 (10th Cir.1967).

In 1973, Taylor purchased an adjoining, roughly 2,500 acre parcel that was also part of the Sangre de Cristo grant (Salazar estate). Taylor's predecessor in title to the Salazar estate had also filed a Torrens title action in 1960 which determined that local landowners had no rights in the estate. Together, the mountain tract and the Salazar estate are known as the Taylor Ranch.

The current case began in 1981. In that year a number of local landowners filed suit in Costilla County District Court. The landowners asserted that they had settlement rights to the Taylor Ranch and that Taylor had impermissibly denied those rights.[2] The court held that the doctrine of res judicata barred the suit because the Salazar Torrens action and the *Sanchez* decision regarding Taylor's Torrens action were binding upon the plaintiffs. *Rael v. Taylor*, No. 81CV5 (Costilla Co. Dist. Ct. Sept. 22, 1986) (Judgment for Defendant on Motion for Judgment on the Pleadings or for Summary Judgment).

The court of appeals affirmed. *Rael v. Taylor*, 832 P.2d 1011, 1014 (Colo.App.1991). This court granted certiorari and reversed and remanded, questioning the constitutional adequacy of the publication notice in the Torrens action. *Rael v. Taylor*, 876 P.2d 1210, 1228 (Colo.1994). We directed the trial court to determine which of the plaintiffs received adequate notice in the Torrens action and to hold a trial on the merits for those who did not have proper notice. *Id.*

On remand, the trial court granted Taylor's motion for summary judgment on the Mexican law claim. The court then bifurcated the proceedings: it determined the due process and class action certification issues before holding a trial on the merits. During the due process phase, the court dismissed most of the plaintiffs. The court determined that seven of the plaintiffs could pursue their claims regarding the mountain tract and that three of the plaintiffs could proceed with their claims regarding the Salazar estate.[3] Without further hearing, the court denied class certification. The court then held a trial on the merits.

After the trial, the court made a finding of fact that the landowners or their predecessors in title had "grazed cattle and sheep, harvested timber, gathered firewood, fished, hunted and recreated on the land of the defendant from the 1800s to the date the land was acquired by the defendant, in 1960." The trial court further found that the community referred to Taylor Ranch as "open range," and that prior to 1960, the landowners "were never denied access to the land." The court also stated that it did "not dispute" that the settlers could not have survived without use of the mountain area of the grant.

Despite theses findings, the court determined that the landowners had not proved prescriptive rights because their use was not adverse. The court further held that the Beaubien Document was not an effective express grant of rights because it did not identify the parties to the rights or the locations where the rights should be exercised. Regarding an implied grant by Beaubien, the court concluded that Colorado law did not recognize the implied rights the landowners claimed. The landowners appealed both the due process determination and the rulings on their claim of rights.

The court of appeals affirmed. *Lobato v. Taylor*, 13 P.3d 821 (Colo.App.2000). The court agreed with the trial court's conclu-

---

**2.** Jack Taylor died during the pendency of this litigation. His son, Zachary Taylor, stepped in as the executor of his father's estate. At some point, the Taylor estate sold the Taylor Ranch to another party. This party bought the land subject to the landowners' claims and subject to this litigation. For the sake of simplicity, Jack Taylor and his successors in title are referred to as "Taylor" in this opinion.

**3.** Taylor claims that the Salazar estate is no longer at issue in this case because our opinion in *Rael* did not expressly discuss this property. We find that the Salazar estate is still at issue. The trial court, on remand from *Rael*, continued to make findings of fact regarding the Salazar estate. To the extent that *Rael* did not specifically address that portion of the Taylor Ranch, it was an oversight.

sions regarding all three of the landowners' theories. Regarding an express grant of rights, the court of appeals engaged in a technical application of the 1863 property laws of the Colorado Territory. *Id.* at 831. The court concluded that the document included neither the "christian and surnames" of the grantees nor an accurate description of the property to be burdened. *Id.* Furthermore, the court of appeals noted that that because the document does not use the words, "and heirs and assigns" it does not indicate that Beaubien intended any rights to run with the land. *Id.* Because the court rejected all of the landowners' substantive claims, the court did not reach the question of whether the trial court erred in its due process decision.

We granted certiorari.

## II. Analysis

The landowners claim rights to graze livestock, gather firewood and timber, hunt, fish, and recreate. Before discussing the sources of the settlement rights, we characterize the claimed rights in order to determine the rules of law that govern them.

## A. The Rights at Issue

The parties, at various points in the voluminous briefing of this twenty-one year-old litigation, agree that the rights at issue are most appropriately characterized as profits à prendre. A profit à prendre—in modern parlance, a profit—"is an easement that confers the right to enter and remove timber, minerals, oil, gas, game, or other substances from land in the possession of another." Restatement (Third) of Property: Servitudes § 1.2(2)(1998) [hereinafter Restatement]. Thus, a profit is a type of easement.

This court has described an easement as "a right conferred by grant, prescription or necessity authorizing one to do or maintain something on the land of another which, although a benefit to the land of the former, may be a burden on the land of the latter." *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1234 (Colo.1998)(quotation marks omitted).

■ An easement can be in gross or appurtenant. An easement in gross does not belong to an individual by virtue of her ownership of land, but rather is a personal right to use another's property. *Lewitz v. Porath Family Trust*, 36 P.3d 120, 122 (Colo.App. 2001). An easement appurtenant, on the other hand, runs with the land. It is meant to benefit the property, or an owner by virtue of her property ownership. *See Lazy Dog*, 965 P.2d at 1234. An easement is presumed to be appurtenant, rather than in gross. *Lewitz*, 36 P.3d at 122; Restatement, *supra*, § 4.5(2).

In this case, the landowners allege that the settlement rights were to be used in connection with their land. They argue that the firewood was used to heat their homes, the timber to frame their adobe houses, and the grazing necessary to the viability of their farms. The landowners also assert that the settlement rights were granted to their predecessors in title by virtue of their interest in their vara strips and were in fact a necessary incentive for settlement in the area.

■ We conclude that the rights the landowners are claiming are best characterized as easements appurtenant to the land. We reach this conclusion from the evidence that under Mexican custom access to common land was given to surrounding landowners, the evidence that this access was used to benefit the use of the land, and the presumption in favor of appurtenant easements.

Having established the nature of the rights at issue, we now turn to the sources of these rights.

## B. Sources of the Rights

The landowners argue that their settlement rights stem from three sources: Mexican law, prescription, and an express or implied grant from Beaubien.

Regarding the Mexican law claim, the landowners claim that community rights to common lands not only are recognized by Mexican law, but also are integral to the settlement of an area. The landowners further point out that in the Treaty of Guadalupe Hidalgo, the United States government agreed that the land rights of the residents

of the ceded territories would be "inviolably respected." Under the landowners' theory, the treaty dictates that the court apply Mexican law to the Taylor Ranch and accordingly recognize the settlement rights.

The landowners further argue that use rights can be found via prescription. For this claim, they point to their regular use of the Taylor Ranch land for over one hundred years until the area was fenced in 1960.

Lastly, the landowners assert that their use rights were obtained by either an express or implied grant from Carlos Beaubien. For this claim, the landowners rely primarily on the Beaubien Document.

The trial court dismissed the Mexican law claim on motion for summary judgment, and after a trial on the merits, rejected the two remaining claims. The court of appeals affirmed. The court of appeals held that the Mexican law claim failed because whatever rights may have existed at the time of the Treaty of Guadalupe Hidalgo were subsequently extinguished by Congress's 1860 Act of Confirmation. *Lobato*, 13 P.3d at 829. The court further held that the landowners could not claim prescriptive rights because their use of the Taylor Ranch was not adverse. *Id.* at 834-35. Lastly, the court held that the Beaubien Document fails as an express grant of rights and that Colorado does not recognize implied easements in the form of profits. *Id.* at 832-33.

■ We agree that the landowners cannot claim rights under Mexican law. Their predecessors in title did not settle on the Sangre de Cristo grant until after the land was ceded to the United States[4] and thus their use rights developed under United States law. Mexican land use and property law are highly relevant in this case in ascertaining the intentions of the parties involved, see *infra*. However, because the settlement of the grant occurred after the land was ceded

to the United States, we conclude that Mexican law cannot be a source of the landowners' claims.

We disagree, however, with the court of appeals' resolution of the landowners' other claims. While the Beaubien Document cannot support an express grant of rights, when coupled with the Gilpin agreement and other evidence, it supports a finding of a prescriptive easement, an easement by estoppel, and an easement from prior use.

### 1. The Beaubien Document

As evidence of a grant of rights from Carlos Beaubien, the landowners rely primarily on the Beaubien Document. The document was written by Beaubien in 1863, one year before his death.

One English translation of the document reads, in part:

Plaza of San Luis de la Culebra, May 11, 1863.

It has been decided that the lands of the Rito Seco remain uncultivated for the benefit of the community members (gente) of the plazas of San Luis, San Pablo and Los Ballejos and for the other inhabitants of these plazas for pasturing cattle by the payment of a fee per head, etc. and that the water of the said Rito remains partitioned among the inhabitants of the same plaza of San Luis and those from the other side of the vega who hold lands almost adjacent to it as their own lands, that are not irrigated with the waters of the Rio Culebra. The vega, after the measurement of three acres from it in front of the chapel, to which they have been donated, will remain for the benefit of the inhabitants of this plaza and those of the Culebra as far as above the plaza of Los Ballejos. . . . Those below the road as far as the narrows will have the right to enjoy the same benefit. . . . *[No one may] place any obstacle or obstruction to anyone in the*

4. It is evident from the record that permanent settlement of the Sangre de Cristo grant did not begin until after 1848. Although some settlement was attempted prior to the Treaty of Guadalupe Hidalgo, those settlers did not succeed, due, in part, to Indian hostilities and aggression between the United States and Mexico. The plaintiffs, in their second amended complaint,

admit that "[t]he erection of Fort Massachusetts in 1852 . . . marked the start of the settlement of the area in earnest" and that the permanent settlements were established as follows: "Costilla and Garcia in 1849; San Acacio and San Luis in 1850; San Pablo in 1852; San Francisco and La Valle in 1854; and Chama in 1855."

*enjoyment of his legitimate rights ....*
Likewise, each one should take scrupulous care in the use of water without causing damage with it to his neighbors nor to anyone. According to the corresponding rule, *all the inhabitants will have enjoyment of benefits of pastures, water, firewood and timber, always taking care that one does not injure another.*

(Emphases added.)

The landowners assert that this document evidences an express grant of settlement rights on the Taylor Ranch land. The trial court concluded that the Beaubien Document did not vest any rights in the Taylor Ranch. The court noted that although the document lists rights of pasture, water, firewood, and timber, the only locations specified for access are the Rito Seco and the vega, two areas that the parties agree are not part of the Taylor Ranch. The trial court did admit extrinsic evidence to determine whether there was a "latent ambiguity" in the document. However, because the court ultimately found that the document was unambiguous, it ruled that extrinsic evidence could not be considered in interpreting the document.

The court of appeals affirmed. *Lobato,* 13 P.3d 821. The appeals court agreed that the Beaubien Document was ultimately unambiguous and that the trial court properly treated the extrinsic evidence of Beaubien's intent. *Id.* at 832. The court then applied 1863 Colorado property law and concluded that the Beaubien Document did not meet the formal requirements for conveying rights to the landowners' predecessors in title. *Lobato,* 13 P.3d at 831. Moreover, the court held that profits must be expressly granted and thus rejected any claim of implied rights. *Id.* at 832–33.

We agree that the Beaubien Document does not meet the formal requirements for an express grant of rights. However, we find that the document, when taken together with the other unique facts of this case, establishes a prescriptive easement, an easement by estoppel, and an easement from prior use.

■ Extrinsic evidence is relevant in interpreting the Beaubien Document. In *Lazy Dog,* we articulated when a court could examine extrinsic evidence in order to ascertain the nature of an easement. In that case, we expressly followed the Restatement and concluded that "[o]ur paramount concern in construing a deed is to ascertain the intentions of the parties." *Lazy Dog,* 965 at 1235. We also recognized that "circumstances surrounding the grant may be relevant to interpreting the language of the grant." *Id.* at 1236; *see also* Restatement, *supra,* § 4.1(1)(noting that an easement "should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created"). Moreover, the question of whether or not the document is ambiguous "may be answered by reference to extrinsic evidence." *Lazy Dog,* 965 P.2d at 1235.

■ Here, we look to extrinsic evidence to construe the Beaubien Document for two reasons. First, as *Lazy Dog* tells us, extrinsic evidence may reveal ambiguities. Second, the document is ambiguous on its face with respect to where the landowners could exercise their rights.

*Lazy Dog* tells us that extrinsic evidence may reveal ambiguities in modern documents; that principle can be only more true with respect to the Beaubien Document. We are attempting to construe a 150 year-old document written in Spanish by a French Canadian who obtained a conditional grant to an enormous land area under Mexican law and perfected it under American law. Beaubien wrote this document when he was near the end of his adventurous life in an apparent attempt to memorialize commitments he had made to induce families to move hundreds of miles to make homes in the wilderness. It would be the height of arrogance and nothing but a legal fiction for us to claim that we can interpret this document without putting it in its historical context.

For the most part, the document is reasonably specific in identifying places where

rights are to be exercised.[5] That is not true with respect to the rights asserted by the landowners. The key language reads: "According to the corresponding rule, all the inhabitants will have enjoyment of benefits of pastures, water, firewood and timber, always taking care that one does not injure another."

Thus, given the specificity of other parts of the document, the lack of specificity in this sentence creates an ambiguity. We cannot determine from the face of the document what lands were burdened by the rights Beaubien conveyed to the first settlers.

Following *Lazy Dog*, we look to the extrinsic evidence in this case. Amici assert that the contrast between the specificity of the majority of the Beaubien Document and the casual reference to the settlement rights at the end of the document can best be explained by the events surrounding the execution of the document. Beaubien penned the document at a time when settlement was moving to the northern area of the grant, which lies northwest of the Taylor Ranch area. At that time, he wrote the Beaubien Document to establish common rights to the area in and around San Luis and at the same time memorialize settlement rights that had already been in existence in the more southern areas of the grant, where Taylor Ranch is located.

We agree with the amici. From the trial court findings, expert testimony, the documents associated with the grant, and a review of the settlement system under which Beaubien and the settlers were operating, we draw two conclusions. First, we conclude that the location for the settlement rights referenced in the Beaubien Document is the mountainous area of the grant on which Taylor Ranch is located. Second, we conclude

that Beaubien meant to grant permanent access rights that run with the land.

■ We first discuss the location for the rights. The evidence in this case establishes that the reference to pasture, water, firewood, and timber in the Beaubien Document refers to access on the mountain area of the grant of which Taylor Ranch is a part.

First, the trial court found that the landowners or their predecessors in title accessed the Taylor Ranch land for over one hundred years to exercise the rights outlined in the Beaubien Document. This strongly suggests that the parties understood that the Taylor Ranch land was the location of their access rights.

Second, experts testified that the resources listed in the document were only available in the Taylor Ranch area of the grant. Expert testimony established that summer grazing, wood, and timber were only available in the mountain area of the grant.[6] This is perhaps the most significant evidence that points to the Taylor Ranch as the location of the rights.

Third, the landowners' access rights are expressly mentioned in Taylor's deed. The deed subjects his property interest not only to "rights of way of record," but also to "all rights of way heretofore located and now maintained and used on, through, over, and across the same." It further subjects the conveyance to "claims of the local people by prescription or otherwise to rights to *pasturage, wood, and lumber and so-called settlement rights* in, to, and upon said land." (Emphasis added.) This resolves any doubt that the access rights were meant to burden Taylor's land.

■ There is also ample evidence that the document was meant to create permanent

5. The locations referenced in the beginning portion of the document all refer to areas in and around the present day town of San Luis. For example, the document explains that the vega is three acres in front of the chapel that still exists in the town of San Luis.

6. Of Taylor's 80,000 acres, a 77,000 acre area has historically been called La Sierra or the Mountain Tract. The Taylor Ranch is situated on the eastern most part of the grant. The

eastern boundary of the Sangre de Cristo grant is along the peaks of the Sangre de Cristo range. Thus, the Taylor Ranch is in the mountain portion of the grant on which wood is available. In contrast, the western portion of the grant is along the valley floor and thus was cleared and used for farming. There are obviously other mountain areas of the original million-acre Sangre de Cristo grant other than the Taylor Ranch; these are not at issue here.

rights that run with the land. Both the settlement system under which Beaubien and the settlers were operating and the Gilpin agreement are strong evidence of this.

Access to common areas was an integral feature of the settlement system under which the settlers and Beaubien were operating. Under Spanish and Mexican law, the government awarded community and private grants for the purpose of settling the frontier. *See* Malcolm Ebright, *Land Grants and Lawsuits in Northern New Mexico* 23 (1994).

The Mexican grants were issued under specific procedures. The governor would refer a petition to the local *alcalde* (mayor) for his recommendations on whether the grant should be made. Availability of pasture, water, and firewood on common lands was among the primary considerations:

> The primary considerations were whether the land was being used or claimed by others, the sufficiency of the petitioner's qualifications, and in the case of a community grant, *the availability of resources like pasture, water, and firewood.*

*Id.* (emphasis added). Large private grants were made during the Mexican period. If the recommendation from the *alcalde* was favorable, the governor would make the private grant to an individual. The individual's ownership, however, was conditional upon successful settlement of the grant.

Agriculture and stock raising were the primary means of subsistence for the settlers on the grants. *Id.* at 25. The settlers supplemented their irrigated plots by use of commonly accessible community or private grant lands for gathering firewood and grazing livestock:

> The pattern of land tenure and use was the foundation for these tightly knit communities. Produce from their small irrigated plots *supplemented by the use of common lands for gathering firewood and for grazing a few head of livestock* furnished the bare necessities for the village families, a lifestyle to which they were accustomed.

Ira G. Clark, *Water in New Mexico, A History of Its Management and Use* 34 (1987) (emphasis added).

Under colonial and Mexican law, the difference between a community grant[7] and a private grant was that the common lands of the community could not be sold; the grantee of a private grant could sell the lands. *See* Ebright, *supra*, at 25.

Expert reports submitted in this case reveal that Beaubien and the original settlers operated under this traditional system. Common areas were not only a typical feature but a necessary incentive for settlement.

As discussed above, because the Sangre de Cristo grant was part of the United States at the time permanent settlement began, this Mexican settlement tradition is not the source of the landowners' rights. However, because the settlers and Beaubien were so familiar with the settlement system, it is highly relevant in ascertaining the parties' intentions and expectations.

The express language in the Gilpin agreement, recorded one year after the Beaubien Document, further supports the conclusion that the rights referenced in the Beaubien Document were meant to burden the land. Gilpin was Beaubien's immediate successor as owner of the grant land. The Gilpin agreement contains an express condition confirming the settlers' rights:

> [Gilpin agrees to the] express condition that the settlement rights before then conceded by said Charles Beaubien to residents of Costilla, Culebra & Trinchera, within said Tract included, shall be confirmed by the said William Gilpin as confirmed by him.

---

7. Because the lands of a community grant could not be sold and were held in common in perpetuity, settlers could use them for hunting, fishing, gathering herbs, and rock quarrying, among other uses, without any question or conflict with subsequent landowners or the need of courts to define the intended uses. Some private grants operated like community grants; others did not. *See* Ebright, *supra*, at 25. Two examples of community grants in the Sangre de Cristo grant are the San Luis vega and chapel referenced in the Beaubien Document. The chapel and the vega continue to exist in the town of San Luis and they are used for the originally intended purposes as a church and as a common pasture. Although a portion of the Beaubien Document establishes these two community grants, the general references to settlement rights were meant to memorialize access and use rights. This is clear from the Gilpin agreement.

This deed also recites that the settlers paid consideration to Beaubien for those rights and that Gilpin succeeds to the settlers' obligations to Beaubien, including payments due on promissory notes held by Beaubien and his agents. The Gilpin agreement is in Taylor's chain of title and Taylor's own deed expressly refers to the landowners' settlement rights.

Thus, we conclude both that rights were granted and exercised from the time of settlement and that the Beaubien Document memorialized them. Moreover, we conclude that the location for the rights is the mountain portion of the grant of which Taylor Ranch is a part, and that the benefit and burden of these rights were meant to run with the land.

■ We do not take issue with the court of appeals' application of 1863 Colorado property law to the Beaubien Document. It is not surprising that Carlos Beaubien failed to comply with the nuances and technical requirements of the conveyance of real property rights. Beaubien's failure to comply with the territorial property law, however, is not the end of the inquiry. The territorial supreme court made it clear that rights to access and use the property of another landowner could be found in the law of implied easements. *Yunker v. Nichols,* 1 Colo. 551 (1872). The law of implied easements recognizes that rights may be implied even though they were not properly expressly conveyed. This well-established area of property law is concerned with honoring the intentions of the parties to land transactions and avoiding injustice.

### 2. Implied Grant of Settlement Rights

The evidence in this case overwhelmingly supports the conclusion that the landowners have implied rights in the Taylor Ranch. We first review the law of implied servitudes. Second, we discuss how traditional settlement practices, repeated references to settlement rights in documents associated with the Sangre de Cristo grant, the hundred year history of the landowners' use of the Taylor Ranch, and other evidence of necessity, reliance, and intention support a finding of implied rights in this case.

### a. Implied Servitudes

■ An easement is created if the owner of the servient estate either enters into a contract or makes a conveyance intended to create a servitude that complies with the Statute of Frauds or an exception to the Statute of Frauds. Restatement, *supra,* § 2.1.

Servitudes that are not created by contract or conveyance include servitudes created by dedication, prescription, and estoppel. Those which are not created by express contract or conveyance are the implied servitudes, which may be based on prior use, map or boundary descriptions, necessity, or other circumstances surrounding the conveyance of other interests in land, which give rise to the inference that the parties intended to create a servitude.

*Id.* § 2.8 cmt. b; *see also Wright v. Horse Creek Ranches,* 697 P.2d 384, 387–88 (Colo.1985)(noting that an easement may be established by "necessity; by preexisting use; by express or implied grant; or by prescription"); *Wagner v. Fairlamb,* 151 Colo. 481, 484, 379 P.2d 165, 167 (1963)(noting that implied easements are "not expressed by the parties in writing, but ... arise[ ] out of the existence of certain facts implied from the transaction").

Easements can be implied in a number of situations. Easements created by prescription, Restatement, *supra,* § 2.17; easements by estoppel, *id.* § 2.10; and easements implied from prior use, *id.* § 2.12, are the most relevant to this case. We discuss each of these in turn, discussing both Colorado case law and the Restatement, which is consistent with our precedent.

■ An easement by prescription is established when the prescriptive use is: 1) open or notorious, 2) continued without effective interruption for the prescriptive period, and 3) the use was either a) adverse or b) pursuant to an attempted, but ineffective grant. *Id.* § 2.17, § 2.16.

■ A court can imply an easement created by estoppel when 1) the owner of the servient estate "permitted another to use

that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked," 2) the user substantially changed position in reasonable reliance on that belief, and 3) injustice can be avoided only by establishment of a servitude. *Id.* § 2.10. Whether reliance is justified depends upon the nature of the transaction, including the sophistication of the parties. *Id.* § 2.9 cmt. e. The Restatement does not have a requirement of deception, neither does Colorado.[8] *See Graybill v. Corlett,* 60 Colo. 551, 154 P. 730 (1916); *Hoehne Ditch Co. v. John Flood Ditch Co.,* 68 Colo. 531, 191 P. 108 (1920). An easement by estoppel is an equitable remedy. It recognizes that when a landowner induces another to change position in reliance upon his promise, he is estopped from then denying the existence of the rights simply because they did not meet the formal conveyance rules. The rule "is founded on the policy of preventing injustice." *Id.* § 2.10.

Colorado law has repeatedly recognized this equitable right. For example, in *Graybill,* we examined a landowner's right to maintain a water ditch across the land of his neighbor. The owner of the servient estate had granted the owner of the dominant estate the right to establish a ditch across his land. This was an oral promise; the parties did not comply with conveyance and recording formalities. 60 Colo. at 552, 154 P. at 730. In reliance on the parol agreement, the owner of the dominant estate used the ditch as the irrigation source for his land and cleaned, repaired, and made improvements to the ditch. *Id.* On these facts, we noted that, "[i]t is too well settled to require discussion that under the circumstances above stated a licensee holds under an irrevocable license, and his right is as valid as if acquired by grant." *Id.* at 553, 154 P. at 731; *see also Hoehne Ditch Co.,* 68 Colo. 531, 191 P. 108 (applying the "well settled" rule that "although an oral contract relating to realty is within the statute [of frauds], where a consideration has passed, and it has been fully

performed by both parties and possession taken in pursuance thereof, the bar of the statute is removed and equity will enforce the right thus acquired").

An easement implied from prior use is created when 1) the servient and dominant estates were once under common ownership, 2) the rights alleged were exercised prior to the severance of the estate, 3) the use was not merely temporary, 4) the continuation of this use was reasonably necessary to the enjoyment of the parcel, and 5) a contrary intention is neither expressed nor implied. Restatement, *supra,* § 2.12; *see also Lee v. Sch. Dist. No. R-1,* 164 Colo. 326, 435 P.2d 232, 235–36 (1967); *Proper v. Greager,* 827 P.2d 591, 593 (Colo.App.1992). The rationale for this servitude is as follows:

> The rule stated in this section is not based solely on the presumed actual intent of the parties. It furthers the policy of protecting reasonable expectations, as well as actual intent, of parties to land transactions.

Restatement, *supra,* § 2.12 cmt. a.

Colorado has long applied this implied easement. This court has found an easement from prior use in *Lee.* In *Lee,* the owner of one parcel of land claimed a right of way across his neighbor's land to access his property. The servient and dominant estates had once been under common ownership and this right of way was used before the severance of title. Seven years after the severance of title, the defendant bought the servient estate and attempted to block the right of way, claiming a lack of an enforceable agreement. This court found that an easement from prior use had been established. *Lee,* 164 Colo. at 333, 435 P.2d at 236.

Similarly, the court of appeals found an easement from prior use in *Proper.* There, the plaintiff landowner used his neighbor's land to access his property. This use had begun when the two plots were under common ownership. Although the neighbor allowed this use, there was no formal agreement. The neighbor sought to rescind his permission after twenty-five years of the

---

8. *Aubert v. Town of Fruita,* 192 Colo. 372, 559 P.2d 232 (1977), has no impact here because that case deals with estoppel in the context of water rights as opposed to estoppel in the context of easements, such as ditches.

easement's use, and to construct a fence. *Proper* 827 P.2d at 592. The court found that under these facts, an easement from prior use had been established. *Id.* at 594.

Having outlined the law of implied easements, we now turn to the facts of this case.

### b. Application to the Landowners' Claims

Despite the long history of implied easements in Colorado, the court of appeals in this case rejected the landowners' claims of an implied easement. The court did so because it believed that, although easements in the form of access rights could be implied, easements in the form of profits could not. *Lobato*, 13 P.3d at 833. In reaching this conclusion, the court misapplied a 1964 decision of this court, *Dawson v. Fling*, 155 Colo. 599, 396 P.2d 599 (1964).

In *Dawson*, the Flings claimed easement rights to a lake owned by a corporation. The document establishing the rights was a deed which read, in part, that the lake could be used "for boating and swimming purposes, for the use of said grantees by themselves, their heirs and assigns, their servants, agents, friends, guests, and whomever they may select." *Id.* at 602, 396 P.2d at 601. Although the deed specified boating and swimming rights, the Flings petitioned the court to find that they had the right to fish as well. This court concluded that the language of the conveyance clearly limited the rights to boating and swimming and thus declined to imply fishing rights as well. *Id.* at 604, 396 P.2d at 602.

In dicta, this court asserted that "[a] right *to profits à prendre must be* expressly granted." *Id.*, 396 P.2d at 601. However, from the circumstances of the case it is clear that this court declined to find implied rights because the deed of conveyance expressly limited the rights: "A court cannot rewrite a contract and thereby change its terms when it is plain, clear and unambiguous." *Id.* at 604–05, 396 P.2d at 602. In *Dawson*, then, a crucial element of an implied easement was missing because a contrary intention was expressly stated in the deed. For that reason, we declined to imply additional profits in *Dawson*.

Although this court has not addressed implied profits for over thirty-five years, there is a modern trend to apply the same rules to easements of access and to profits. *See, e.g., State v. Kortge*, 84 Or.App. 153, 733 P.2d 466, 469 (1987)(noting that "[w]hether defendants' rights are in the nature of a profit à prendre or an easement, the interests in this case are governed by the same general rules"); *Figliuzzi v. Carcajou Shooting Club*, 184 Wis.2d 572, 516 N.W.2d 410, 415 (1994)(applying a statutory rule of easements to profits in part because the court was persuaded by the Restatement of Property § 450 Special Note (1944), which states that it treats "easements" and "profits" the same because "in no case was there a rule applicable to one of these interests which was not also applicable to the other").

The Restatement explains that, although some profits such as mineral and water rights [9] have specific rules, generally as between easements in the form of access rights and easements in the form of profits, "there are no doctrinal differences between them." Restatement, *supra*, § 1.2 reporter's note.[10] "Generally, the rules governing creation, interpretation, transfer, and termination of easements and profits are the same in American law." *Id.* § 1.2 cmt. e.

Easements and profits are treated equally because the same public policy and practical considerations that underlie implied rights of

---

**9.** The case before us contains no claim to water use based on the Beaubien Document. We note that on April 10, 1852, the settlers of the Sangre de Cristo grant commenced construction of the San Luis People's Ditch, the oldest irrigation right in Colorado in continuous use. *See* Carl Ubbelohde et al., *A Colorado History, Revised Centennial Edition* 195 (1976). All water in Colorado is a public resource, dedicated to the beneficial use of public agencies and private persons wherever they might make beneficial use of the water under use rights established as prescribed by law. *See Bd. of County Comm'rs v. Park County Sportsmen's Ranch, LLP*, 45 P.3d 693, 706 (Colo.2002).

**10.** The first Restatement of Property, concluding that the same rules apply to easements of access as to profits, dropped the term "profit." However, because the word "profit" is useful as a descriptive term, it survives. Restatement, *supra*, § 1.2 cmt. e.

access also underlie implied profits. A recognition that parties do not always comply with strict rules of express conveyance, a desire to effectuate the intent of the parties, and the aim of fairness apply equally to easements and profits.

Colorado law is replete with precedent that reflects a strong policy to be true to parties' intentions and recognizes that Colorado's unique history and geography further necessitate judicial recognition of implied rights in land. *See, e.g., Roaring Fork Club v. St. Jude's Co.*, 36 P.3d 1229, 1231 (Colo.2001)(noting that "our lawmakers [have] recognized that our arid climate require[s] the creation of a right to appropriate and convey water across the land of another"); *Lazy Dog Ranch*, 965 P.2d at 1235 (in determining the scope of an easement, noting that the "paramount concern" is to ascertain the intentions of the parties and that when a deed is silent as to a particular right, the court shall look at the circumstances surrounding the transaction); *Thompson*, 895 P.2d at 540 (in implying an easement, noting that "sound public policy dictates that land should not be rendered unfit for occupancy and that there is a presumption, therefore, that whenever a party conveys property he conveys whatever is necessary for the beneficial use of that property" (quotation marks omitted)); *Yunker*, 1 Colo. at 554 (noting that certain water rights are necessary for enjoying land and that the law will "imply a grant of such easement where it is especially necessary to the enjoyment of the dominant estate," and that such rights come not out of the literal terms of the contract, but rather out of "pre-existing and higher authority of laws of nature, of nations, or of the community to which the parties belong").

Thus, the aim of honoring parties' intentions and avoiding injustice that the Restatement expresses has long been the goal of Colorado law. Specifically, Colorado has a strong history of implying servitudes based on equitable concerns. As the Restatement concludes, it is arbitrary and inconsistent to apply these principles to easements of access but not to profits.[11] Such a limitation would be directly contrary to our legacy of implied easements.

■ Having concluded that the trial court and court of appeals in this case incorrectly held that Colorado law does not recognize implied easements in the form of profits, we now apply the law of implied easements to the landowners' claims.

■ Our review of the record leads us to conclude that there is ample evidence to imply certain rights in the landowners to access and use the Taylor Ranch. The prior unity of title of the landowners' and Taylor's land; the necessity of the rights; the significant reliance upon the promise of these rights; the fact that the rights were exercised for over one hundred years; and fact that these rights were memorialized in the Beaubien Document, the Gilpin agreement, and every deed of conveyance in Taylor's chain of title, satisfy every element of the Restatement test and the implied easements we recognized in the cases discussed above.

### i. Prescriptive Easement

Because Taylor's deed indicates that Taylor's ownership of the land is subject to the landowners' prescriptive rights, we begin with an application of the law of prescriptive easements. The court of appeals in this case concluded that the landowners failed to prove a prescriptive easement claim because their use was not adverse. *Lobato*, 13 P.3d at 834. The court erred in this respect.

■ Although adversity is a necessary requisite for adverse possession claims, *Smith v. Hayden*, 772 P.2d 47, 52 (Colo. 1989), it is not required for a prescriptive easement. Courts often find prescriptive easements even when the owner of the servient estate allows the use. Significantly, the Restatement articulates that a prescriptive use is either:

---

11. Notably, one of the goals of the Restatement is to "present[ ] a comprehensive modern treatment of the law of servitudes that substantially simplifies and clarifies one of the most complex and archaic bodies of 20th century American law.... It is designed to allow both traditional and innovative land-development practices using servitudes without imposing artificial constraints as to form or arbitrary limitations as to substance." Restatement, *supra*, Introduction at 3.

(1) a use that is adverse to the owner of the land or the interest in land against which the servitude is claimed, or

(2) a use that is made pursuant to the terms of an intended but imperfectly created servitude, or the enjoyment of the benefit of an intended but imperfectly created servitude.

Restatement, *supra,* § 2.16.

Although an easement by prescription without adversity has been codified only in the recent restatement, "it has always been present in American servitudes law." *Id.* § 2.16 cmt. a. Because many jurisdictions technically required adversity for a prescriptive easement, decisions in those states often used "convoluted explanations" to explain how a permitted use was actually hostile and met the adversity requirement. *Id.* Some courts acknowledged an exception to the adversity rule in certain circumstances. *See, e.g., Nat'l Props. Corp. v. Polk County,* 386 N.W.2d 98, 105 (Iowa 1986)(noting that there may be a prescriptive easement even "where the original use was with a servant [sic] owner's consent"); *Kirby v. Hook,* 347 Md. 380, 701 A.2d 397, 404 (1997)(applying an exception to the "general rule [that] permissive use can never ripen into a prescriptive easement ... where there has been an attempt to grant an irrevocable easement which is void because of the statute of frauds"). Other jurisdictions, such as Colorado, simply glossed over the adversity requirement without comment. *See, e.g., Wright,* 697 P.2d at 388 (finding an easement by prescription in the form of a right of way across the servient estate even though the use of the right of way was permitted and ultimately reduced to writing); *Proper,* 827 P.2d at 595–96 (listing adversity as a requirement of an easement by prescription but then, although the parties stipulated that the use was permissive, finding a prescriptive easement for access and use of a commercial parking lot via a complex application of presumptions).

■ It has long been established, then, that the element of adversity is not required in all circumstances. It is not required when other evidence makes clear that the parties intend an easement, but fail "because they do not fully articulate their intent or reduce their agreement to writing, or because they fail to comply with some other formal requirement imposed in the jurisdiction." Restatement, *supra,* § 2.16, cmt. a. Thus, the court of appeals in the current case erred when it required a finding of adversity in all circumstances.

Having established that adversity is not required when a grant has been imperfectly attempted, we turn to the facts of the current case. The trial court's findings of fact and our interpretation of the Beaubien Document fit every element of a prescriptive easement.

■ First, the use must be open and notorious. There is no doubt that the landowners' use was well known to Taylor and his predecessors in title. The trial court noted that Taylor's predecessors in title not only knew of the landowners' access, but they even went so far as to direct the location of grazing. Most significantly, Taylor and his predecessors in title had express notice of the landowners' claims of right from the language of their deeds. The use was open and notorious.

■ Second, the use must continue without effective interruption for the prescriptive period. In Colorado, the statutory period is eighteen years. § 38–41–101, 10 C.R.S. (2001); *Proper,* 827 P.2d at 595. Here, the trial court explicitly found that the landowners and their predecessors in title "grazed cattle and sheep, harvested timber, gathered firewood, fished, hunted and recreated on the land of the defendant from the 1800s to the date the land was acquired by the defendant, in 1960." The trial court also found that this access was never denied. This more than satisfies the statutory time period.

■ Third, the access must either be adverse or pursuant to an intended, but imperfectly executed, grant. Here, the access was permissive, rather than adverse. However, there is ample evidence of an intended grant of these rights. The Beaubien Document, although imperfect as an express grant, evidences Beaubien's intent to grant rights to the landowners' predecessors in title (*see supra*). Moreover, the express language in

the deeds of conveyance for the Taylor Ranch, from Gilpin ultimately to Taylor, indicate an intention that the rights burden the land.

 Thus, the landowners have established a prescriptive claim.[12]

### ii. Easement by Estoppel

 The landowners have also established every element of an easement by estoppel. First, Taylor's predecessors in title "permitted [the settlers] to use [the] land under circumstances in which it was reasonable to foresee that the [settlers] would substantially change position believing that the permission would not be revoked." Restatement, *supra*, § 2.10. The settlers' reliance was reasonable because rights were expected, intended, and necessary. It was expected because of the Mexican settlement system discussed above. Also discussed above, this settlement system, combined with the actual practices and the deeds associated with the Taylor Ranch, show that rights were intended.

The rights were also necessary. The plaintiffs' expert, Dr. Marianne Stoller, testified that access to wood was necessary to heat homes, access to timber was necessary to build homes, and access to grazing was necessary for maintaining livestock.[13] Moreover, Beaubien included each of these resources in a lease to the United States for the first military post in Colorado. *See* LeRoy R. Hafen & Ann W. Hafen, *Colorado: A Story of the State and its People* 130 (1947).

The trial court found that during the 1850s Beaubien executed a lease to the United States government for the maintenance of Fort Massachusetts on grant land. In this lease Beaubien granted the army the right to "pasture, cut grass, timber and collect firewood" on Beaubien's land. We can safely assume that the United States was more sophisticated in its dealings with Beaubien than were the landowners' predecessors in title and that it insisted on putting Beaubien's promises into writing.[14] Under these circumstances, it is reasonable to foresee that that a settler would substantially change position believing that the permission would not be revoked.

 The second element, that the user substantially change position in reasonable reliance on the belief, is easily found. The landowners' predecessors in title settled Beaubien's grant for him. They moved onto the land and established permanent farms.

 The third element, the avoidance of injustice, is also undeniably present. The original Sangre de Cristo grant was given on the condition that it be settled. Indeed, under Mexican law, the grant would have been revoked if settlement did not succeed. The settlers, then, fulfilled the condition of the grant that made Beaubien fee owner of one million acres of land.

Beaubien attracted settlers to the area by convincing them that he would provide them with the rights they needed for survival. Beaubien knew that families would rely on

---

**12.** The trial court in the current case heard evidence and ruled on the prescription claim as a matter of judicial economy. However, the court also ruled that the landowners could not bring a prescription claim because Taylor did not have adequate notice. Our review of the record does not support this determination. Although the landowners did not formally file for leave to add a prescription claim until 1992, all of their factual allegations from the birth of this case clearly implicate prescriptive rights—particularly their claim that they and their predecessors in title continuously accessed the Taylor Ranch for over one hundred years. Significantly, the deed of conveyance explicitly informed Taylor that he purchased the land subject to the "claims of the local people by *prescription* or otherwise." (Emphasis added.) Taylor had adequate notice of this claim.

**13.** Dr. Stoller, at one point in her testimony, also mentioned that the settlers fished, hunted, and recreated on the land. She did not, however, indicate that such practices were necessary. Significantly, in her written report, which the landowners submitted to the trial court, Dr. Stoller lists the landowners' rights as use rights to "pasture, firewood, timber, and water."

**14.** The landowners' expert, Dr. Stoller, agreed that the rights included in Beaubien's lease to the government were significant: "he gave [the United States Army] use rights for pasture, cutting grass, firewood and timber to the adjacent lands. . . . Thus he was following the same practice in the 1863 document for his settlers, and for the same reasons—the need for these resources for human survival."

his promises and leave their homes to travel hundreds of miles on foot or horseback to establish new homes.

A condition of the conveyance of Beaubien's land, from Gilpin down to Taylor, was that the owner honor these rights. Although these promised rights were exercised for over one hundred years, although these rights were necessary to the settlers' very existence, and although Taylor had ample notice of these rights, Taylor fenced his land over forty years ago. It is an understatement to say that this is an injustice.

The landowners have established each element of an easement by estoppel.

### iii. Easement From Prior Use

■ Lastly, every element of an easement from prior use has been shown. First, both Taylor's and the landowners' lands were originally under the common ownership of Beaubien who owned the entire Sangre de Cristo grant before settlement. *See Tameling v. United States Freehold Land & Emigration Co.*, 2 Colo. 411 (1874).

Second, the rights were exercised prior to the severance of the estate. As discussed above, many of the rights the landowners claim were needed and expected for life in the San Luis Valley. This necessity existed from the first days of settlement—indicating that these rights were exercised prior to severance of title.

The third and fourth prongs—that the use was not merely temporary and is reasonably necessary to the enjoyment of the land—are also easily established. The trial court's findings of fact establish that the rights were exercised from the time of settlement until Taylor came on the scene. Moreover, as discussed above, the rights were reasonably necessary.

Lastly, no contrary intention is expressed or implied; thus, the fifth element is present.

Custom, expectation, practice, and language in the documents and deeds surrounding the Taylor ranch property indicate not only that a contrary intention did not exist, but that the parties affirmatively intended for these rights to exist.

All five elements of an easement from prior use have been established.

### C. Extent of the Rights

Having found that the landowners have implied profits in the Taylor Ranch, we now must address the scope of those rights. We imply the rights memorialized in the Beaubien Document. We do so for four reasons.

First, the document is the strongest evidence we have of the parties' intentions and expectations. Second, the rights in the document were likely the most necessary. Third, the Fort Massachusetts lease lists these same rights. Fourth, the document is the only evidence we have of an attempted express grant. This is particularly important for the prescriptive easement claim. *See* Restatement, *supra*, § 2.16 cmt. a.[15]

■ Accordingly, we hold that the landowners have implied rights in Taylor's land for the access detailed in the Beaubien Document—pasture, firewood, and timber. These easements should be limited to reasonable use—the grazing access is limited to a reasonable number of livestock given the size of the vara strips; the firewood limited to that needed for each residence; and the timber limited to that needed to construct and maintain residence and farm buildings located on the vara strips.

### III. Remaining Issues

Over the years, a host of contested issues have arisen in this case; many were not addressed on appeal because the court of appeals' holding that the landowners did not have any rights rendered the ancillary ques-

---

**15.** The landowners acknowledge that the Beaubien Document does not reference rights for hunting, fishing, and recreation and thus that there is no evidence of an express or implied grant of these rights from Carlos Beaubien. However the landowners claim that these rights exist via a prescriptive easement. We disagree. As discussed above, in order to find a prescrip-

tive easement in the absence of adversity, there must be evidence of an attempted express grant. In this case, the Beaubien Document is the only evidence of an attempted express grant to the landowners. Because it makes no reference to hunting, fishing, or recreation, there can be no prescriptive easement for those rights.

tions moot. We have reviewed the remaining issues and conclude that the only appellate issue that must be addressed is whether the trial court engaged in the appropriate due process inquiry on remand from *Rael.*

In *Rael,* we remanded this case for a determination of which landowners received adequate notice in the Torrens title actions. 876 P.2d 1210. Although in *Rael* we highlighted facts in the record that indicated Taylor knew that local landowners claimed rights in the land, on remand the trial court found criteria other than landowning dispositive. The court dismissed most of the plaintiffs, allowing only seven to pursue their claims regarding the mountain tract and only three to pursue their claims regarding the Salazar estate. This must be reviewed.

As a matter of judicial economy, and as a matter of fairness, given the forty-one year denial of access to the Taylor Ranch and this twenty-one year litigation, we decline to remand this case to the court of appeals for a determination of this issue. Rather, we will revisit the due process issue after full briefing, in a separate opinion. *See Ballow v. Phico Ins. Co.,* 875 P.2d 1354, 1364 (Colo.1993)(retaining jurisdiction rather than remanding to the court of appeals as a matter of judicial economy).

### IV. Conclusion

In sum, we imply access rights in the landowners to the Taylor Ranch for reasonable grazing, firewood, and timber. We reject the landowner's claims for hunting, fishing, and recreation. Before we remand to the trial court for a permanent order of access, additional briefing is necessary in order to determine which landowners received adequate notice in the Taylor and Salazar Torrens actions. The clerk of this court will set a briefing schedule for the parties.

Justice MARTINEZ dissents only as to part II.C.

Justice KOURLIS dissents, and Justice RICE joins in the dissent.

Justice COATS does not participate.

Justice MARTINEZ dissenting only as to part II.C.

As the opinion by the chief justice correctly notes, this case involves the settlement rights of people who have been largely dispossessed of their rights in land when Taylor fenced the property. There is little dispute that the settlers enjoyed extensive rights in the lands that comprise the Taylor Ranch for about one hundred years. Rather, the dispute concerns the extent of the rights, if any, that survive when we construe settlement rights conceived in a different era pursuant to contemporary standards. In short, the difficulty of this case is that we must address the grave injustices imposed upon the settlers' successors in interest by interpreting documents from a different era, intended to reflect Beaubien's intent, through the perspective of modern property law. Nonetheless, equitable principles in our modern jurisprudence, properly construed and applied, permit us to recognize the rights of the settlers and their successors in interest.

Because I concur with the chief justice's analysis and conclusion that the landowners have access rights through a prescriptive easement, an easement by estoppel, and an easement from prior use, I join to make it the majority opinion and refer to it as such herein. As the majority explains, the Beaubien document is an imperfect attempt at an express grant of rights clearly "meant to create permanent rights that run with the land," maj. op. at 948–949; such access rights were an "integral feature of the settlement system under which the settlers and Beaubien were operating." *Id.* at 949. Additionally, the Gilpin agreement provides further support that the settlement rights granted by Beaubien were intended to run with the land because that agreement required that Gilpin take the land on the condition that he recognize and confirm the settlement rights.

I also agree with the majority's analysis and conclusions regarding the implied servitudes upon which it bases its holding. The majority determines that the same rules should be applied to easements and profits and adopts the Restatement's position that easements by prescription do not always re-

quire a finding of adversity; instead such easements may result from an intended but imperfectly created servitude.

In addition, I agree with the majority's conclusion that the landowners' access rights are also found through an easement from prior use and an easement by estoppel: The elements for both of these easements are met in this case. I particularly agree with the majority's strong language regarding the injustices that are avoided in finding access rights through an easement by estoppel.

In short, I summarize the majority's analysis, and my support for it, to emphasize the many areas of agreement I have with the majority and the extent to which I concur and join the majority opinion.

However, it is significant to me that the trial court's findings that the landowners also enjoyed access for fishing, hunting and recreation are supported by the record. As a result, I would apply the reasoning of the majority opinion regarding prescriptive easement, easement by estoppel, and easement from prior use to conclude that the landowners have also established access rights for fishing, hunting, and recreation. Thus, while I join the majority opinion as to its analysis regarding the source of the landowners' rights, I do not join part II.C. of the majority's opinion, which excludes fishing, hunting, and recreation rights from its holding. However, I recognize that part II.C. of the chief justice's opinion is the controlling opinion in this case.

More specifically, though I agree with the majority's finding that the Beaubien document is an imperfect one and accordingly must be considered alongside extrinsic evidence in order to find the landowners have access rights through a prescriptive easement, an easement by estoppel, and an easement from prior use, see maj. op. at 947–948, I believe that document cannot be read to limit the landowners' access rights to grazing, firewood, and timber. In my view, the imperfect nature of the Beaubien document requires us to look beyond that document to determine the full scope of the landowners' access rights. As a result, I would not limit the landowners' access rights; instead, based on the evidence in the record demonstrating

that "settlement rights" encompassed more than grazing, firewood, and timber, I would also include access rights for fishing, hunting, and recreation through a prescriptive easement, an easement by estoppel, and an easement from prior use.

## I. The Trial Court Findings Regarding Settlement Rights for Fishing, Hunting, and Recreation

The trial court made strong findings that "[t]he plaintiffs' predecessors in title grazed cattle and sheep, harvested timber, gathered firewood, fished, hunted and recreated on the land of the defendant from the 1800s to the date the land was acquired by the defendant, in 1960." The trial court also found that, prior to 1960 when Taylor fenced the land, the landowners referred to that land as "open range" and that the landowners were "never denied access to the land for grazing of cattle, sheep, harvesting timber, gathering firewood, fishing, hunting, or recreating." My review of the record reveals that that the trial court's findings of fact that fishing, hunting, and recreation were included in the settlement rights contemplated by the Beaubien document are correct.

Several expert historians filed reports in this case, some of whom also testified at trial. Some of these reports include commentary regarding fishing, hunting, and recreation as part of settlement rights. For example, the report filed by Dr. Michael Meyer, professor emeritus at the University of Arizona, concluded that the common lands in the settlement systems provided material resources such as "fuel to keep warm during the cold winter months, a varied diet of fruits, vegetables, grains and meat." The reference to "meat" as one of the resources available from the common lands implicitly refers to hunting that took place on the common lands. Dr. Meyer's report further expanded on the uses of the common areas, stating that

[t]he common lands were put to many uses in Spanish and Mexican New Mexico, including fishing, hunting (of wild turkeys, deer and other game), threshing, recreation, the gathering of wild herbs, fruits and nuts (especially piñones) and the disposal of refuse but most importantly they

were used for grazing, watering of stock animals, and the cutting of wood.

Dr. Meyer's report also explained that among the various primary documents giving a legal basis for common lands use is the Plan de Pitic, which was the founding document for several New Mexico towns, but also "specifically given general applicability for all of the towns in the northern New Spain." This document provided that common lands be set aside around each settlement "so that the settlers can use them for recreation [and] go out with their cattle without doing damage."

Dr. Marianne Stoller, professor of anthropology at the Colorado College, filed an expert report and testified at trial. Although her report does not explicitly mention fishing, hunting, and recreation, her report concludes that the Beaubien document clearly guarantees the landowners' right of access to common lands. Significantly, her report also concludes that the Beaubien document "is made more understandable by looking at the context of the political and social circumstances surrounding its creation, and by understanding the nature of the economic circumstances, ecology, and topographical characteristics of the area."

Although Dr. Stoller's report did not expressly address fishing, hunting, and recreation, her trial testimony did. When asked to express her opinion regarding the use of the common lands by successive generations of landowners between 1863 and 1960, she replied, in pertinent part, that "[t]hey were used for hunting of wild animals. They were used for fishing.... And recreation." When asked whether there was specific, visible evidence of such use of the common lands, she replied:

> There were roads that went partway up most of the tributary valleys.... There were trails that crisscrossed the mountain lands.... There were signs of people having cut wood for the purpose I described. There were animals, there were there were sheep and cattle grazing. There were wild animals to be seen. There were fish in the streams.

Additionally, Dr. Stoller, consistent with her report, testified that one must look beyond the text of the Beaubien document when interpreting the intent of Beaubien and the settlers with regard to access rights. When asked about Beaubien's purpose in authoring the document, Dr. Stoller replied that his purpose was to record the use rights of the people to the common lands. However, she specifically pointed out that one reading the Beaubien document must look beyond the actual text of that document in interpreting the rights it includes:

> He set aside land for pasture, lowlands, the vega lands, specifically saying that these lands were to be used only for animals that were necessary for domestic purposes.... And he designated the lands that could be used for pastures, for flocks—*and he did not use the word "flocks," but this is to be understood,* given the nature of the economy of these people, an agro-pastoral economy.

(Emphasis added.) Dr. Stoller further explained the need to look beyond the text of the document to properly interpret the scope of the access rights it contemplated:

> Because [the Beaubien document], like any document, has to be interpreted. And one has to go beyond it to understand the geography. That document contains place names. One has to know where those place names are. It refers to different types of lands. One has to know what those lands are, where they are. All those kinds of things are necessary in order to interpret such a document.... The lands spoken of in the document include the agricultural lands, they include the mountain lands, they include the pasture lands, the vega lands. Lands, in other words, that provide different resources and that are for different purposes.

This testimony demonstrates the necessity of looking to other evidence beyond the Beaubien document in order to fully understand the different uses that settlers made of these lands. Such other evidence demonstrates that fishing, hunting, and recreation were uses to which the lands were put.

Thus, Dr. Stoller's testimony is significant for two reasons. First, her testimony establishes that any interpretation of the rights

contemplated by the Beaubien document must necessarily go beyond the specific text of that document and consider other evidence of the social, political, historical, and economic circumstances at the time the document was authored; we must look beyond the text of the Beaubien document to determine the scope of the access rights to which the landowners are entitled.

Second, Dr. Stoller's testimony demonstrates that fishing, hunting, and recreation, although not expressly mentioned in the Beaubien document, were important to the settlers, just as grazing and gathering firewood and timber were. Accordingly, I believe that the evidence of settlers' fishing, hunting, and recreation activities is evidence of the "political and social circumstances surrounding" the creation of the Beaubien document, and that such evidence increases our "understanding the nature of the economic circumstances, ecology, and topographical characteristics of the area."

Further, the expert report and testimony of Dr. Maria Montoya, professor of history and American culture at the University of Michigan, also supports the trial court's findings. The majority of Dr. Montoya's scholarly research and writing relates to the Maxwell land grant. The Maxwell grant, although not the subject of the present case, is nonetheless closely related to the Sangre de Cristo grant that is the subject of this case. The Maxwell grant, located directly to the southeast of the Sangre de Cristo grant, was also owned by Beaubien. Dr. Montoya testified that the history of the two grants is closely related and that she studied the Beaubien document in the context of her research of the Maxwell grant.

More specifically, Dr. Montoya's report noted that the activities of the settlers that lived on both the Maxwell and the Sangre de Cristo grants were similar. She explained that on both grants, people "settled along the river valleys using similar land use settlement patterns of community living based around a plaza with privately held strips of land (varas), and common areas used for *hunting*, grazing, and wood collection." (Emphasis added.) Her report traces the use of the land that makes up both grants

back to the Plains tribes, opining that although these tribes practiced agriculture,

> hunting was the mainstay of their existence.... Large animals such as buffalo, mountain sheep, antelope, deer and elk provided not only food but also material goods. They used the hides to make housing covers, sinew for thread, rawhide for ropes and straps, and tanned skins for clothing and shoes.

We can infer that this use of the lands for hunting continued after the Mexican government began to approve land grants such as the Maxwell and Sangre de Cristo grants based on community opposition to the Maxwell grant. The Maxwell grant, unlike the Sangre de Cristo grant, did not expressly reserve rights to common lands for settlers through a document similar to the Beaubien document. As a result, some members of the community feared that the Maxwell grant would be put to commercial use to the exclusion of historical, local use by the settlers for hunting and grazing. In particular, soon after Beaubien received the Maxwell grant, a community member named Father Jose Antonio Martinez lodged an objection. One of Martinez's grounds for objecting was that putting the lands that comprised the Maxwell grant (which were put to similar use as the lands that comprised the Sangre de Cristo grant) into private hands would deprive those living on the lands of their livelihood, which consisted of hunting as well as grazing livestock.

The conclusion that hunting was an important aspect of the settlers' activities on both the Maxwell and Sangre de Cristo grants is supported by the findings of another expert. A report filed by Malcolm Ebright, an historian, attorney, and president of the Center for Land Grant Studies in New Mexico, also concluded that Martinez opposed the Maxwell grant because the grant "included the communal hunting and grazing lands" of settlers.

Finally, testimony from at least one of the landowners also supports the trial court's conclusion that recreation was included in the settlement rights contemplated by Beaubien and the settlers when the document was authored. Emilio Lobato, Jr., who resides

near the Taylor Ranch, can trace his ancestry back to Cristobal Lobato, one of the early settlers. In addition, his great-grandmother was an original settler in 1851. He described the use he and his family made of the land when he was a child, stating that he would use the land for "hiking, horseback riding, just exploring." He also testified that he and his family would go on picnics on the Taylor Ranch land. Although such contemporary recreational use of the Taylor Ranch lands occurred several generations after Beaubien authored the document and the original settlers arrived, the fact that such use persisted from generation to generation is further evidence that recreation rights were considered settlement rights and thus contemplated by the Beaubien document.

In sum, the evidence presented at trial and through expert reports, as well as the testimony of at least one lay witness, supports the trial court's findings of fact that fishing, hunting, and recreation were an important part of the settlers' activities in the region that includes the Taylor Ranch at the time the Beaubien document was authored in the 1860s. In addition, much of the expert testimony and reports also concluded that the Beaubien document must be construed by considering the social, economic, historical, and geographical context in which it was authored, and not strictly based on the actual text. As a result, applying the same analysis as the majority, I conclude that fishing, hunting, and recreation rights were contemplated by the Beaubien document and must therefore be included in the access rights to which the landowners are entitled.

## II. The Scope of Access Rights

My disagreement with the majority opinion is with its application of easements by prescription, by estoppel, and from prior use to limit the landowners' access rights to "the rights memorialized in the Beaubien document." Maj. op. at 956. Instead, applying the legal frameworks of easements by prescription, by estoppel, and from prior use to the trial court's findings of fact results in my determination that the landowners are entitled to access rights for fishing, hunting, and

recreation as well as for grazing, firewood, and timber.

Looking, as we must, beyond the Beaubien document, which is imperfect, to extrinsic evidence to determine the full scope of the access rights intended by Beaubien reveals that access rights for fishing, hunting, and recreation must be recognized. The Gilpin agreement is one source of important extrinsic evidence. Significantly, both the Beaubien and Gilpin documents refer to settlement rights as if the scope of those rights was understood. Because I believe that there was no attempt to enumerate the specific settlement rights in either document, that neither document specifically mentions fishing, hunting, and recreation is not dispositive as to the scope of the settlement rights accorded to the first settlers.

As a result, extrinsic evidence beyond these documents must be considered. Such extrinsic evidence includes the social, economic, political and historical character of settlement rights. As my discussion of the record reveals, evidence adduced at trial supports the trial court's findings that fishing, hunting, and recreation were contemplated by the Beaubien document, and thus the Gilpin agreement, although not mentioned individually in either document. Accordingly, all six access rights sought by the landowners are properly recognized through a prescriptive easement, an easement by estoppel, and an easement from prior use.

Because I would hold that the landowners have access rights for all six settlement rights, I am unpersuaded by the four reasons given by the majority for limiting its recognition of access rights to grazing, firewood, and timber. See maj. op. at 956. I briefly address each of these four reasons.

First, the majority asserts that the "document is the strongest evidence we have of the parties' intentions and expectations." Id. While I agree that the Beaubien document is strong evidence of the parties' intentions, that document cannot be considered as the *only* expression of those intentions, or even the strongest expression. Instead, because the document is imperfect and ambiguous, extrinsic evidence must be considered in reconstructing those intentions. Because the

trial court's findings of fact regarding all six settlement rights are supported by the record, I find that it is logically consistent to determine that the landowners have established access rights for all six settlement rights; to find otherwise treats the Beaubien document as a proper, perfect, express grant.

Second, the majority contends that the rights in the document were "likely the most necessary." *Id.* I agree that grazing herds and gathering firewood and timber were necessary for the survival of the settlers. The record supports such a conclusion. *See id.* However, a finding that fishing and hunting were necessary settlement rights is also supported by the record. Further, although recreation is arguably not necessary for survival, there is ample evidence in the record that recreation was considered an important settlement right. *See* part I, *supra.*

Third, the majority gives weight to the fact that the Fort Massachusetts lease lists the same rights as the Beaubien document to support its exclusion of fishing, hunting and recreation rights. However, because the record reveals that the purpose of Fort Massachusetts was importantly different from the purpose of the Sangre de Cristo settlement, I do not give great weight to that lease in discerning the full scope of the landowners' access rights. More specifically, as explained by Dr. Stoller, the purpose of Fort Massachusetts was to "protect the settlements ... and to further U.S. policy towards Indians of rounding them up and confining them to a reservation." Although the rights to graze and collect timber and firewood articulated in the lease were necessary activities for maintaining an army fort, the fundamentally different purposes between Fort Massachusetts and the Sangre de Cristo settlements lead me to give little weight to that lease as evidence regarding the scope of the landowners' access rights.

Finally, the majority argues that the Beaubien document is the "only evidence we have of an attempted express grant," which is important for a claim of a prescriptive easement. *See* maj. op. at 956. While I agree with this as a statement of fact, I do not believe that it provides a basis for discriminating between the settlement rights of graz-

ing and collecting firewood and timber that are contained in the Beaubien document and the settlement rights of fishing, hunting, and recreation that are supported by other evidence in the record. As noted, the Beaubien document is an imperfect, ambiguous document that must be interpreted and construed by referring to extrinsic evidence; the evidence adduced at trial strongly supports the trial court's findings of fact that all six rights were considered settlement rights.

Accordingly, I believe that the legal concepts of prescriptive easement, easement by estoppel, and easement from prior use, when applied to the evidence adduced at trial, compel my conclusion that the landowners are entitled to all six settlement rights.

### III. Conclusion

While I agree with the majority's articulation of the controlling law in this case, I disagree with its application of that law to limit the scope of the landowners' access rights. Because I conclude that the trial court's findings that "[t]he plaintiff's predecessors in title grazed cattle and sheep, harvested timber, gathered firewood, fished, hunted and recreated on the land of the defendant from the 1800s to the date the land was acquired by the defendant, in 1960" are supported by the record, I would find that the landowners enjoy access rights for grazing, collecting firewood and timber, fishing, hunting, and recreation on the Taylor Ranch. Accordingly, I dissent from part II.C. of the majority opinion and join the majority opinion as to all other parts.

Justice KOURLIS dissenting.

Although I have great sympathy for the historic and present plight of the landowners in this action, I cannot support the majority opinion for two reasons. First, it is my view that in 1863 Charles Beaubien attempted to make a community grant for the benefit of the inhabitants of the plazas of San Luis, San Pablo, and Los Ballejos. The law in effect at the time did not recognize such a grant and instead required individual identification of grantees. Hence, the Beaubien Document had no legal effect.

Second, I find no ambiguity either in the legal description in the Document or in the absence of grantee specificity. The legal description referred to the lands of the Rito Seco. The trial court found that the lands of the Rito Seco do not overlap with the current Taylor Ranch. There is no ambiguity; rather, the Document simply does not apply to Taylor Ranch. Additionally, the omission of grantee names was not an ambiguity: it was a clear attempt to create a communal grant, which was not legally recognized.

Because the Document is not ambiguous in any pertinent part, it cannot support an implication of rights not expressly set forth. Prescriptive easements, easements by estoppel, and easements from prior use do not apply to these facts.

Accordingly, I respectfully dissent from the majority opinion and would instead affirm the court of appeals' opinion upholding the trial court.

## I. Community Land Grants

The historical records indicate that someone seeking a land grant would address a petition to the governor of the region describing the land and the individual's qualifications for ownership. Malcolm Ebright, Land Grants & Lawsuits in Northern New Mexico 23 (1994). If the petition was approved by the governor, and the alcalde (the mayor), then the governor would issue the grant. *Id.* There were two types of grants of land from the government: private grants to individuals who would own the land and who could sell it after they met a requirement of establishing possession of the land; and community grants.[1] *Id.* at 24.

Large private grants were made in an effort to settle new areas. The individual would not gain full title to the property until he had encouraged a sufficient number of people to move into the area, settle it, and establish communities.

In a community grant, each settler would receive an allotment of land for a house, an irrigable plot, and the right to "use the remaining unallotted land on the grant in common with the other settlers for pastures, watering places, firewood, and logs for building. . . . [T]he common lands were owned by the community and could not be sold." Malcolm Ebright, Land Grants & Lawsuits in Northern New Mexico 25 (1994).

Charles Beaubien received a private grant from the government conditioned upon settlement requirements. Beaubien, in turn, created what I construe to be a community grant to the prospective inhabitants of three plazas. In the Document, he stated that:

It has been decided that the lands of the Rito Seco remain uncultivated for the benefit of the community members (gente) of the plazas of San Luis, San Pablo and Los Ballejos and for the other inhabitants of these plazas for pasturing cattle by the payment of a fee per head, etc. . . . According to the corresponding rule all the inhabitants will have enjoyment of benefits of pastures, water, firewood and timber, always taking care that one does not injure another.

The Document is clear on its face that it pertains to the Rito Seco and intends to convey certain rights to the inhabitants of the three plazas. Beaubien enjoyed private land: he granted communal rights on that land, pursuant to Spanish custom and tradition. Under the Beaubien Document, the settlers received a communal right to use certain lands for their personal needs. Now, the landowners assert rights that their predecessors historically exercised in common with a number of other inhabitants of the area. Those rights are not recognized either by statute or case law.

## II. Communal Grants Are Not Recognized In Our Law

### A. Territorial Laws

In 1863, the year Charles Beaubien executed the Beaubien Document, under Colorado Territorial law, a document conveying any interest in real estate had to meet several

---

1. As one commentator notes, the themes found in the land tenure and law in Spain and Mexico are repeated in the southwestern United States in the nineteenth century: a tension between private land and communal land, and the importance of Spanish custom. Malcolm Ebright, *Land Grants & Lawsuits in Northern New Mexico* 21 (1994).

formal requirements, including the requirements that it incorporate an accurate description of the property and the names of the grantees:

> the christian and surnames of the ... grantees ... and ... an accurate description of the premises, or the interest in the premises intended to be conveyed, and shall be subscribed by the party or parties making the same, and be duly proved or acknowledged, before some officer authorized to take the proof or acknowledgment of deeds, or by his, her or their attorney in fact.

Territorial Laws of Colo., 1st Sess., An Act Concerning Conveyances of Real Estate, 64, 64, § 2 (1861). The requirement that the document identify grantees by name is indicative of the territorial legislature's overt decision not to honor community grants that failed to mention specific grantees.

The Beaubien Document flatly fails to meet that requirement.[2] The Beaubien Document does not give the christian and surnames of the grantees, instead only referring generally to the "community members" and "inhabitants" of specified villages. That omission is a legal deficiency that makes the document invalid as a conveyance under the operative law.

Compliance with real property law is a matter of substantial importance. See IV American Law of Property § 18.27 (A. James Casner ed., 1952) [hereinafter Casner]. In the early years of our history, the questions of who owned what and who could sell what were legitimate and pervasive concerns. As a citizenry, we clearly believed in the sanctity of private property and the ownership rights associated with it. However, we struggled with how to clarify those rights as against those who would dispute them, and how to secure title to property such that it would become marketable to a subsequent purchaser. In fact, in Colorado's early history, one of the issues to which the territorial government fell heir was the question of how to adjudicate land claims and how to establish a common repository for preserving written claims to specific lands. See II Colorado and Its People: A Narrative and Topical History of the Centennial State 372–73 (Leroy R. Hafen ed., 1948).

Under the common law, the grantor merely warranted that he was seised of, or possessed of, the title that he purported to convey. The obvious deficiencies of such a system led to the eventual enactment of recording acts and other statutory conveyancing requirements in every state. 2 Cathy Stricklin Krendl, Colorado Methods of Practice § 62.1 (4th ed.1998).

The regulation of property transfer is strictly a matter of state law. Casner, supra, § 18.27. As the Supreme Court has noted, "[a]s it is indisputable that the general welfare of society is involved in the security of the titles to real estate and in the public registry of such titles, it is obvious that the power to legislate as to such subjects inheres in the very nature of government." Am. Land Co. v. Zeiss, 219 U.S. 47, 60, 31 S.Ct. 200, 55 L.Ed. 82 (1911); see also BFP v. Resolution Trust Corp., 511 U.S. 531, 544, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) ("It is beyond question that an essential state interest is at issue here: We have said that 'the general welfare of society is involved in the security of the titles to real estate' and the power to ensure that security 'inheres in the very nature of [state] government.'") (alteration in original).

Private property ownership is nothing without a " 'bright line rule' to determine the validity of a title and of its potential encumbrances with predictability and without the need for litigation." Michael H. Rubin & E. Keith Carter, Notice of Seizure in Mortgage Foreclosures and Tax Sale Proceedings: The Ramifications of Mennonite, 48 La. L.Rev. 535, 592 (1988).

Our legislature adopted a thorough statutory regime intended to ensure titles to real property are secure and marketable. *See*

---

**2.** The trial court found that in 1856, before he executed the Beaubien Document, Charles Beaubien entered into a lease with the United States government that met all statutory requirements, thereby demonstrating that Beaubien was aware of the requirements for conveying use rights and profits à prendre, and could satisfy them when he chose. *Lobato v. Taylor*, 13 P.3d 821, 830 (Colo.App.2000).

§§ 38–34–101 to 38–35–204, 10 C.R.S. (2001). This court, over the decades, has consistently required conveyances to comply with such laws at the time of the document's creation to give full effect to the goal of security and marketability of real property titles. *See, e.g., City of Lakewood v. Mavromatis,* 817 P.2d 90, 96, 101 (Colo.1991) (concluding that, although a city filed and recorded a right-of-way in the road book, because the recordation did not comply with the specific provisions of the 1888 recording statute, the statute in effect at the time of the road petition, it did not give constructive notice to subsequent purchasers; therefore, because the road petition was a transfer of an interest in real property, it had to comply with all the specifications of the applicable recording act); *Hallett v. Alexander,* 50 Colo. 37, 46, 114 P. 490, 494 (1911) ("The evident purpose of the recording statute is, to provide an effectual remedy against the loss accruing to subsequent purchasers of real estate arising from the existence of secret or concealed conveyances thereof unknown to the subsequent purchaser. The remedy is made effectual by requiring every deed to be recorded before it can be of any effect as against such purchasers.").

That a purchaser would know what he is buying by examining the record title to a parcel of real property, and that an owner could be assured that such record title properly evidences every legitimate right that impinges on his fee simple ownership, are matters of no small import. *City of Lakewood,* 817 P.2d at 94 (noting that recording acts serve the important purpose of permitting a purchaser to rely on the condition of title as it appears of record and creating an accessible history of title).

Therefore, very simply, the Beaubien Document, like every other real property transfer, must be held to the standards of the law in effect at the time it was executed in order to protect the certainty and marketability of property interests. The Document does not comport with those laws, and it, therefore, has no validity as to the landowners here.[3]

The Document intended to create a grant to the members of a community: such a grant was in contravention of the applicable statutes and was, therefore, invalid.

### B. Case Law

Just as our statutes do not recognize communal grants, so too, case law reaches the same result. New Mexico has been the location of most of the litigation concerning communal grants in the United States. Over the course of that litigation, those courts have declined to recognize communal grants, and have further determined that they must look to the record title to the property, and not inquire behind it into the traditions or history that might ' support converting those grants into individual grants:

[T]he courts established as a basic principle one of not looking behind the title, thus precluding any examination of laws and customs prevailing at the time of annexation by the United States. If title papers were available to prove the right of use, the tribunals treated the land as belonging to the community in fee simple. They also recognized the right of partition of the common lands among the heirs of the original grantees ... in total disregard of any right of usufruct in descendants of families which had enjoyed the use of the common lands for generations.

Ira G. Clark, Water in New Mexico: A History of Its Management and Use 36–37 (1987). Another commentator observed that:

Because it was considered a real property question, it was left to the New Mexico courts to translate the right of usufruct into common law terms, that is, to define the interest the residents of land grants have in their common lands as opposed to the interest of the patentees. In general, the New Mexico Supreme Court has decided on very narrow legal grounds that the

---

**3.** Not only does the Document not identify grantees, but it also omits the words "and heirs and assigns." As the court of appeals noted, the absence of that language in a document conveying an interest in real property meant that the conveyance passed only a life estate. *Lobato,* 13

P.3d at 831 (citing *In re Estate of Newby,* 146 Colo. 296, 299, 361 P.2d 622, 623–24 (1961) (stating that, at common law, without the use of words of limitation "and his heirs and assigns" a conveyance passed only a life estate)).

patentees have complete title to the common lands. As a result, the rights of community land grant residents have been damaged and, in some cases, extinguished. Michael J. Rock, *The Change in Tenure New Mexico Supreme Court Decisions Have Effected Upon the Common Lands of Community Land Grants in New Mexico*, 13 Soc. Sci. J. 55, 56 (1976).

For example, the Tierra Amarilla Grant was a community grant that was patented to an individual, Francisco Martinez. The New Mexico Supreme Court ultimately denied the right of usufruct upon the common lands portion of the grant, holding that, if the land grant were a "private grant, the [Congressional] act of confirmation merely carried out the treaty obligation; if it were a community grant, the common lands were merely government domain and the confirmation constituted a grant de novo to the grantee, Francisco Martinez. Under either view the absolute title was vested, by the act of confirmation in the said grantee." *H.N.D. Land Co. v. Suazo*, 44 N.M. 547, 105 P.2d 744, 749 (1940).

In a successor case in New Mexico concerning the same land grant, the plaintiffs asked the court to legitimize rights based upon language that conveyed "the right to pasture and water livestock, to cut wood and to use the roads upon all the lands, suitable for such purposes, of the entire Tierra Amarilla Land Grant." *Martinez v. Mundy*, 61 N.M. 87, 295 P.2d 209, 214 (1956), *overruled on other grounds by Evans Fin. Corp. v. Strasser*, 99 N.M. 788, 664 P.2d 986, 989 (1983). The court declined, citing *H.N.D. Land Co.* for the proposition that the original grant conveyed all rights to Martinez and none to the settlers of the region. The court went on to examine the question of whether the plaintiffs had acquired rights by adverse possession and concluded that they had not because "a prescriptive right cannot grow out of a strictly permissive use, no matter how long the use"; and because

[t]he claim by the appellants that they have acquired by grant or prescription, the right to cut wood, water livestock, pasturage and the use of roads was not shown to have been exclusive to the appellants but on the contrary was claimed by many others. The claim being in common with and similar to that of the general public in this area, the appellants certainly could not acquire a private easement unto themselves.

*Martinez*, 295 P.2d at 214.

Similarly, in *Sanchez v. Taylor*, 377 F.2d 733 (10th Cir.1967), the Tenth Circuit declined to give legal significance to community rights even in the context of adverse possession. *Id.* at 738–39. That court addressed the acquisition of the same prescriptive profits on the Taylor Ranch that the landowners here claim. In concluding that usage in common by the inhabitants of the area had not vested them with prescriptive profits, the court first noted that "the public cannot acquire by custom or common prescription profits à prendre in another's land." *Id.* at 738; *see also* 3 Herbert Thorndike Tiffany, *Real Property* § 842 (3d ed. 1939 & Supp. 2001) (noting that "there can be no prescriptive right of profit in the public"); *id.* § 935 ("[A] right [by the public] to take profits from the land, as distinct from the mere right to use the land, cannot be established by custom, since the effect of such a custom would be to exhaust the profits.").

Finally, the court observed that in dealing with similar claims for profits on land originating from a Mexican land grant, the New Mexico Supreme Court held:

"The claim by the appellants that they have acquired by grant or prescription, the right to cut wood, water livestock, pasturage and the use of roads was not shown to have been exclusive to the appellants but on the contrary was claimed by many others. The claim being in common with and similar to that of the general public in this area, the appellants certainly could not acquire a private easement unto themselves. All circumstances must be considered in determining the acts that would lead to a prescriptive right and we do not find such acts present in such force as to refer to a prescription."

*Sanchez*, 377 F.2d at 739 (quoting *Martinez*, 295 P.2d at 214). Again applying Colorado law, the Tenth Circuit held that the use of land for pasturage, natural products, and

timber does not ordinarily constitute adverse possession. *Id.* (citing *Smith v. Town of Fowler*, 138 Colo. 359, 367, 333 P.2d 1034, 1038 (1959) ("The pasturage of cattle on unfenced land cannot be regarded as hostile and adverse to the owner of such land.")).

The Tenth Circuit concluded that the landowners' claims were tantamount to an assertion of unlimited equitable ownership and thus inconsistent with Taylor's fee-simple title. *Sanchez*, 377 F.2d at 739.

In short, American legal tradition has chosen to honor private property rights, sometimes to the detriment of communal rights. I have found no court that would recognize the easements that the landowners here urge. Because real property rights depend upon predictability and clarity of law, by attempting to do justice here in contravention of our precedent, we risk injustice elsewhere.

### III. The Beaubien Document Cannot Support Implied Rights

#### A. Ambiguity

The majority does not dispute that the court of appeals correctly applied the applicable laws to the Beaubien Document and agrees that the document cannot act as an express grant of rights. However, it concludes that the Document, coupled with extrinsic evidence, supports an implied conveyance of profits. Maj. op. at 946. I disagree.

**4.** In *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1235 (Colo.1998), we held that Colorado generally follows the "four corners" principle when construing deeds, but conditionally allows extrinsic evidence in some circumstances to determine whether the deed is ambiguous. Specifically, we stated, " 'In determining whether a deed is ambiguous, a trial court may conditionally admit extrinsic evidence on that issue, but if it is ultimately determined that the document is unambiguous, the conditionally admitted evidence must be stricken.' " *Id.* (quoting *O'Brien v. Vill. Land Co.*, 794 P.2d 246, 249 n. 2 (Colo.1990)).

**5.** Specifically, the witness testified that there are large timbered portions of the grant that are not located on the Taylor Ranch. Later in the trial, the witness, while being examined by the defense, testified regarding the area in the grant located to the north of the Taylor Ranch:

Initially, I dispute the conclusion that the court should look to extrinsic evidence at all.[4] However, even considering that extrinsic evidence, I find complete support in the record for the trial court's conclusions that the Document is unambiguous. First, the Beaubien Document is not ambiguous in its legal description as it pertains to the Taylor Ranch. In fact, the Document describes the property as "the lands of the Rito Seco." The lands of the Rito Seco do not include Taylor Ranch. Although the majority asserts that the Document lists uses, specifically, summer grazing, wood, and timber, that are only available in the Taylor Ranch area of the grant, see maj. op. at 948, the trial court made a different factual finding to the effect that the vegetation pattern of the current Taylor Ranch land is identical to that on the land north and adjacent thereto. Further, a witness for the landowners, an architect, land planner, and expert in map generating whose testimony on vegetation the trial court credited, stated that these resources were available throughout the mountainous areas of the Sangre de Cristo grant, not solely on the Taylor Ranch, which occupies only a small portion the grant.[5] The trial court considered evidence bearing on the location of the landowners' use of timber, firewood, and grazing and concluded that: "The evidence clearly established that none of these locations [lands of the Rito Seco] are situate on the land owned by the defendant." *See also Sanchez*, 377

Q. [The area north of the Taylor Ranch] is vegetated in almost the same manner as you've depicted vegetation on the Taylor ranch, isn't it?
A. Yes, the same general patterns would tend to be contiguous.
Q. And carry on farther north; is that fair to say?
A. Yes.
Q. So, would it be fair to say that the line— that the line dividing the north side of the Taylor ranch from the lands to the north of that line are indistinguishable?
. . . .
A. Well, it would be basically a continuation of the vegetation.
Q. Okay. So, one could put to use the lands north of the north boundary of the Taylor ranch in the same fashion that you could put use to the Taylor ranch, itself; is that fair to say?
A. Yes.

F.2d at 737 (stating that the Beaubien Document made no mention of land located on the Taylor Ranch);[6] *Lobato,* 13 P.3d at 831 (concluding that "it is undisputed that the specific locations referenced in the document are not on defendants' property."). The majority acknowledges the trial court's finding that the only locations specified in the Beaubien Document are not located on the Taylor Ranch. Maj. op. at 947. Hence, the Document is not ambiguous in its legal description.

Similarly, there is no ambiguity in the failure of Beaubien to mention individual grantees' names. As I discuss above, he intended to create a communal grant for the benefit of the inhabitants of the three plazas.

Accordingly, I find no basis for viewing the Document as an incomplete or flawed conveyance that can give rise to implied rights.

## IV. Easements

In any event, the three legal theories advanced by the majority for the creation of an easement are not supported by the facts.

### A. Easements Versus Profits À Prendre

I begin with the proposition that I view the distinction between profits à prendre and easements as material. Although in preparing the Restatement of Property, the American Law Institute (ALI) initially referred to both easements and profits as "easements," in 1998 the ALI reversed its position, once again finding the distinction between easements and profits significant. *See* 4 Richard R. Powell, *Powell on Real Property* 34.01[2] (2002). As the majority noted, the Restatement (Third) of Property: Servitudes § 1.2(2) (2000) [hereinafter Restatement] defines a profit à prendre as "an easement that confers the right to enter and remove timber, minerals, oil, gas, game, or other substances from land in the possession of another. It is referred to as a 'profit' in this Restatement." The Restatement distinguishes between easements and profits stating "[p]rofits à prendre are like affirmative easements in that they create rights to enter and use land in possession of another. However, they also create the right to remove something from the land." Restatement, *supra,* § 1.2(2) cmt. (a). It further clarifies, "*Profits are easements plus.* Profits are easements (rights to enter and use land in the possession of another) plus the right to remove something from the land." Restatement, *supra,* § 1.2(2) cmt. (e) (emphasis in original).

Thus, the Restatement acknowledges that profits à prendre provide a greater property interest to the profit holder and, conversely stated, a greater detriment to the servient estate. *See* 8 David A. Thompson, *Thompson on Real Property* § 65.03(a) (1994) (noting, "Despite the fact that profits are now considered by most writers to be governed by the same set of rules as easements, ... [i]t is also clear that functionally the two areas deal with distinctly different kinds of transactions." Thompson also observes that, in the Restatement (Third) of Property introduction (Tentative Draft No. 1, 1989), the ALI highlighted that "[t]he term profit has been resurrected from the oblivion into which it was consigned by the 1944 Restatement

---

**6.** The court in *Sanchez* reasoned that the Beaubien Document must be limited to the lands it specifically references, which lands do not include the Taylor Ranch property. The only other option would be to apply it to the entire grant, which would be inconsistent with Beaubien's intent. *Sanchez,* 377 F.2d at 738. The court stated:

> We agree with the trial court that to construe the instrument as a dedication of the lands to the extent claimed by the appellants would be inconsistent with the contemplated sale of the lands remaining unsold at the time, and to apply it only to the [Taylor Ranch] would require a rewriting of the instrument. None of the settlers, including these defendants, have ever, and do not now, assert any privileges for the use of lands after sale and occupancy by the purchasers. Apparently the conflict arose when the sale to Taylor ended the free use of the lands in the area for pasture, wood, and recreational uses. The hardship caused, however, does not establish a legal right.
>
> By the terms of the agreement between Gilpin and the executors of Beaubien's estate, Gilpin undertook to carry out certain commitments which Beaubien had made to settlers during his lifetime. Essentially, this is a commitment to convey title to certain settlers upon receipt of agreed payments. There is no language in the agreement which could be construed as indicating that either Beaubien or Gilpin intended the dedication which appellants seek to establish.

> *Id.*

because it describes a device that is used for a purpose quite different from the other servitude devices, and occasionally calls for somewhat different considerations, if not different rules.").

Similarly, we have held that profits à prendre involve a greater interest than easements and must therefore be expressly granted. *Alexander Dawson, Inc. v. Fling*, 155 Colo. 599, 603–04, 396 P.2d 599, 601 (1964) (holding that a profit à prendre must be expressly granted and cannot be implied from an easement). Hence, under Colorado law, because profits à prendre are more onerous to the burdened estate than an easement,[7] the importation of laws governing easements is inappropriate.

### B. Easements by Prescription

Under Colorado law, an easement by prescription requires a showing of hostile use, without permission of the owner. The Restatement suggests that easements by prescription can also arise out of a permissive, imperfectly created servitude. This court has never previously adopted that section of the Restatement and these facts do not warrant such a step.

The Restatement, *supra*, § 2.16 allows a prescriptive easement to arise out of a use that began as permissive, under the terms of an imperfect conveyance. The section specifies:

A prescriptive use of land that meets the requirements set forth in 2.17 creates a servitude. A prescriptive use is either

(1) a use that is adverse to the owner of the land or the interest in land against which the servitude is claimed, or

(2) a use that is made pursuant to the terms of an intended but imperfectly created servitude, or the enjoyment of the benefit of an intended but imperfectly created servitude.

Restatement, *supra*, § 2.16 cmt. (a) announces that prescription operates in two separate factual situations. The first situation is a matter of settled law and occurs when the use of the land is without the consent of the owner. *See also id.* § 2.17 cmt. (c) ("In the most common situation, the prescriptive use is made without the consent of the servient owner."). Restatement, *supra*, § 2.16 cmt. (f) further states that to be adverse a use must create a cause of action for interference with an interest in property like trespass, nuisance, or interference with a servitude benefit. To fulfill the definition, the use must be made without authority and without permission of the property owner. *Id.; see also Smith v. Town of Fowler*, 138 Colo. 359, 367, 333 P.2d 1034, 1038 (1959) (" 'An adverse claim must be hostile at its inception, because, if the original entry is not openly hostile or adverse, it does not become so, and the statute does not begin to run as against a rightful owner until the adverse claimant disavows the idea of holding for, or in subservience to another, it actually sets up an exclusive right in himself by some clear, positive and unequivocal act.' "). Uses made pursuant to licenses are not adverse. Restatement, *supra*, § 2.16 cmt. (f). Similarly, uses made pursuant to servitudes created expressly, by implication, or by necessity, are not adverse.[8]

---

7. As a more minor point, I would also observe that the right to graze cattle is probably a profit à prendre coupled with an easement, for it is the right to make some particular and continuing use of property as well as to remove something from it.

8. Restatement, *supra*, § 2.16 cmts. (f) and (g) further provide:

Uses made in subordination to the property owner are not adverse, even if the property owner has not given permission, and the use is not otherwise authorized. The reason is that the property owner is not put on notice of the need to take steps to protect against the establishment of prescriptive rights. . . .

... Subordination requires that the user act with authorization, express or implied, from the landowner, or under a claim that is derivative from the landowner's title. . . .

When a property owner gives permission to use property, the law implies that a license was intended. Unless additional facts suggest otherwise, it is assumed that the parties intended that the property owner retain the right to revoke the license at any time. Permissive uses do not give rise to prescriptive rights.

. . . .

A use that is initially permissive can become adverse only by express or implied revocation or repudiation of the license.

As to the second factual scenario, the Restatement of Property: Servitudes (1944) did not contain the possibility of creating a prescriptive right through an intended but imperfectly created servitude. The earlier Restatement provided: An easement is created by such use of land, for the period of prescription, as would be privileged if an easement existed, provided the use is (a) adverse, and (b) for the period of prescription, continuous and uninterrupted. Restatement of Property: Servitudes § 457 (1944). It further specified: A use of land is adverse to the owner of an interest in land which is or may become possessory when it is (a) not made in subordination to him, and (b) wrongful, or may be made by him wrongful, as to him, and (c) open and notorious. *Id.* § 458.

The ALI did not return to the subject of servitudes until the creation of the Restatement Third. Restatement, *supra*, fwd. The Restatement (Third) of Property introduction (Tentative Draft No. 3, 1993) explains that the creation of the second portion of the Restatement was precipitated by a desire to provide a more satisfactory theory to resolve cases involving common drives and party walls than adverse possession, because under adverse possession, the time for asserting legal claims to recover the possession of land would be limited.

The Restatement proposes that uses involving common driveways, boundary fences, dams, and party walls are ineptly suited to the requirement of adversity because, in these situations, the initial use is permissive and equity demands the continued right to use the common facility; therefore, the Restatement proposes to dispense with the requirement of adversity but otherwise adopt adverse possession law for those circumstances. See Restatement, *supra*, § 2.16

cmt. (a). The Comment suggests that it makes sense to assume that when the parties begin a joint-use arrangement, they intend to create mutual servitudes rather than licenses. *Id.* § 2.16 cmt. (i).

In addressing whether a use that is made pursuant to the terms of an intended but imperfectly created servitude results in a prescriptive easement, only the Michigan Court of Appeals has adopted the second scenario set forth by the Restatement. *Plymouth Canton Cmty. Crier, Inc. v. Prose,* 242 Mich.App. 676, 619 N.W.2d 725, 730 (2000) (finding that where the parties executed an express easement that did not fully articulate the parties' intent to permit loading activities, and those activities occurred under the mistaken belief that the express easement permitted them, the use created a prescriptive easement).

Hence, the Restatement section would allow for claims of prescriptive use to be made in circumstances in which a document conveyed certain rights, but did so imperfectly, and the possessor wishes to validate those rights even through periods when he was making use with permission. The Restatement would itself limit application of the section primarily to common wall or driveway cases.[9]

The section is not consistent with Colorado law. First, it is not consistent with the statutes, which provide that adverse possession occurs only if the use claimed is truly adverse.[10]

Second, it is not consistent with our case law. This court has consistently held that the same requirement of adversity applies to acquiring easement and profit rights by prescription as to the acquisition of title by

---

**9.** The comment to the Restatement assumes that in cases not involving common driveways, party walls, or other joint-use facilities, the parties will affirmatively express their respective intent to create a servitude. *See* Restatement, *supra,* § 2.16 cmts. (h) & (i). It contemplates two applicable situations in which prescription may cure a defect in title in non-common-facility contexts. The first involves uses pursuant to express servitudes that were not in full compliance with the Statute of Frauds. *Id.* § 2.16 cmt. (h). The comment notes that since the intent to create a servitude is clear from the writing and the bene-

ficiary is obvious, these cases do not present factual difficulties. The second scenario contemplates cases involving a claim of prescriptive use based on oral grants or agreements to create a servitude. *Id.* It directs that such claims should only be accepted cautiously because "they directly thwart the purpose of the Statute of Frauds to force parties to provide written evidence of the existence and terms of the interests in lands." *Id.*

**10.** § 38–41–103, 10 C.R.S. (2001)

adverse possession. *See, e.g., Town of Silver Plume v. Hudson,* 151 Colo. 394, 398, 380 P.2d 59, 61 (1963) (holding that to establish a prescriptive easement the " 'possession must be hostile, not only against the *true owner,* but against the world as well. An adverse claim must be hostile at its inception, because, if the original entry is not openly hostile or adverse, it does not become so, and the statute does not begin to run as against a *rightful owner* until the adverse claimant disavows . . . a holding by permission.' ") (emphasis in *Silver Plume* ); *Rivera v. Queree,* 145 Colo. 146, 149, 358 P.2d 40, 42 (1960); (holding that the prerequisites to acquiring a prescriptive easement are the continuous, open, and adverse use of the right of way for the statutory period); Krendl, *supra,* § 65.5(3.1) ("In Colorado, the law of prescription has become an extension of the doctrine of adverse possession, requiring all the elements thereof."). Thus, the adoption of the second prong of the Restatement test, which can create a prescriptive right in the context of permissive, consensual use is contrary to our law, and I would decline to engraft it.

Even if the court adopts the doctrine, the facts of this case do not support its application here. The Beaubien Document is not an imperfectly created servitude. It is a clearly created communal grant to lands within a particular area. The majority's application of the second prong is not merely curing a small defect in an express agreement, as contemplated by the Restatement. We are dealing with a document that was quite clear in its intent and application; however, it is not enforceable at law. In such circumstances, the second prong of the Restatement, even if applied, would not support the creation of prescriptive rights.

### C. Easements by Estoppel

I would also decline to apply principles of easement by estoppel, because there is no showing here of misrepresentation or concealment of material facts by Beaubien or any of his successors in interest. Thompson defines the elements for an easement by estoppel as:

> (1) conduct, acts, language or silence amounting to a representation or concealment of material facts; (2) the party to be estopped either knows the facts or the circumstances require the facts to be imputed to that party; (3) the truth about the facts must be unknown to the party claiming benefit of the estoppel at the time they were acted upon; (4) the conduct must occur with the intention or expectation that it will be acted upon, or under the circumstances that it is both natural and probable that it will be acted upon; (5) the conduct must be relied upon by the other party, and, thus relying, the other party must be led to act upon it; and (6) the other party must in fact act upon the conduct and change position for the worse.

7 Thompson, *supra,* § 60.03(b)(3).

In Colorado case law, easement by estoppel can sometimes arise out of a parol agreement that intends to convey a certain right as a mere license; however, there must be conduct on the part of the party against whom the easement is being asserted that amounts to a false representation or concealment of material facts. *Pagel v. Reyman,* 628 P.2d 166, 168 (Colo.App.1981) (holding that the plaintiffs failed to establish the elements for an easement by estoppel in a case involving a road easement for a trailer park) (citing *Aubert v. Town of Fruita,* 192 Colo. 372, 374–75, 559 P.2d 232, 234 (1977)).[11]

The majority relies upon two cases for the proposition that the facts before us in this case support an easement by estoppel. Both are water cases, and both deal with the acquisition of ditch rights by parol agreement. Both are inapposite, in my mind, because they are predicated on the underlying policy that is expressed as follows:

> It is indeed a generally prevailing state policy in those states dependent upon irri-

11. *Aubert* is a case involving the assertion of senior water rights. The court declined to find that the defendant was estopped from claiming the rights, relying for the principles of estoppel upon a real property ownership case. *Jacobs v. Perry,* 135 Colo. 550, 555–56, 313 P.2d 1008, 1011–12 (1957) (defendants claimed that the titled owners to the property were estopped from contesting their rights because the owners had accepted the benefit of improvements on the property).

gation largely for successful agriculture, both in the interest of economy and to prevent any unnecessary waste of land in the construction and use of ditches, that, where one ditch can answer the purpose of more, the right to use the same ditch is granted to others than the owners. *Hoehne Ditch Co. v. John Flood Ditch Co.,* 68 Colo. 531, 540–41, 191 P. 108, 112 (1920). In both cases, *Hoehne* and *Graybill v. Corlett,* 60 Colo. 551, 553, 154 P. 730, 731 (1916), the court permitted the establishment of a ditch right-of-way by estoppel without the necessary element of misrepresentation of a material fact, but only in the context of water rights. To the contrary, in *Bijou Irrigation District v. Empire Club,* 804 P.2d 175, 185–86 (Colo.1991), we declined to permit the petitioners from asserting that the Irrigation District was estopped from objecting to use of a reservoir for recreational purposes because, although the District had knowledge of the facts, there were no findings regarding unreasonable delay in the assertion by the District of its rights. Also on point is *Holbrook Irrigation District v. Arkansas Valley Sugar Beet & Irrigated Land Co.,* 42 F.2d 541 (D.Colo.1929), in which the plaintiffs sought certain water rights by operation of estoppel. The court there noted that equitable estoppel requires overt acts and declarations of the party charged, designed to induce another to alter his position to his detriment all of which must be proven by clear and convincing evidence. *Id.* at 548.

There has been no showing in this case that Beaubien or Gilpin either misrepresented material facts or intended the landowners to rely to their detriment upon a parol agreement. Indeed, to my knowledge, the only context in which such a doctrine has been applied to the acquisition of easements has involved ditches and ditch rights, an area in which rights are so firmly entrenched as to be included within the Colorado Constitution.[12]

### D. Easements by Prior Use

Easements by prior use, sometimes referred to as easements of necessity, can be implied when a property owner has used one part of a single piece of property for the benefit of another part of the property and then divides and conveys the property. In those circumstances, the new possessor of "the previously benefited portion of the land may also possess an easement over the previously burdened part of the property." 7 Thompson, *supra,* § 60.03(b)(4).

Thompson suggests that the elements of an easement implied from prior use are: "(1) common ownership followed by a conveyance separating the unified ownership; (2) before severance, the common owner used part of the property for the benefit of the other part, a use that was apparent, obvious, continuous and apparent; (3) and the claimed easement is necessary and beneficial to the enjoyment of the parcel previously benefitted." 7 Thompson, *supra,* § 60.03(b)(4)(i). The underlying premise is that, because the retained property was necessary to enjoyment of the conveyed property as shown by historical use—the grantor must have intended to convey the easement with the grant.

In *Wagner v. Fairlamb,* 151 Colo. 481, 379 P.2d 165 (1963), the plaintiff constructed a road across the defendant's property that followed a mule pack or wagon trial that was in existence when the property was under common ownership. *Id.* at 483, 379 P.2d at 167. This court recognized that an easement may be an express easement (which appears in a deed or contract for the sale of land) or an implied easement (which arises out of the existence of certain facts implied from the transaction). *Id.* at 484, 379 P.2d at 167. The court noted that implied easements have generally not been looked upon with favor by the courts. *Id.* The elements adopted by the court to prove an implied easement were:

(1) Unity and subsequent separation of title; (2) obvious benefit to the dominant and burden to the servient tenement existing at the time of the conveyance; (3) use of the premises by the common owner in their altered condition long enough before the conveyance to show that the change

---

12. Article XVI, section 7 of the Colorado Constitution establishes the right of all persons and corporations for rights of way to convey water.

was intended to be permanent; and (4) necessity for the easement. *Id.* at 484–85, 379 P.2d at 167. Noting that all four elements must be present to support the creation of an easement, the court in *Wagner* rejected an easement, finding that the use was "a terminated intermittent" rather than permanent use. *See also Lee v. Sch. Dist. No. R–1,* 164 Colo. 326, 332, 435 P.2d 232, 236 (1967)(easement by necessity found because of adequate proof of consistent, permanent use of road prior to severance).

In *Bromley v. Lambert & Son, Inc.,* 752 P.2d 595 (Colo.App.1988), at the time of the severance of the parcel, the plaintiffs had no access to their land except by right of way over the defendant's property. *Id.* at 596. The city later constructed a public street adjoining the plaintiffs' property. *Id.* The court stated:

> Colorado recognizes implied easements that arise by pre-existing use. A showing of necessity is required to establish an easement by pre-existing use. Proof of necessity is required as of the time of the severance of the original property into separate estates, because it is an indication of the intent of the original grantor and grantee that a permanent servitude be imposed on the servient estate in favor of the dominant estate.

*Id.* (citations omitted); *see also Proper v. Greager,* 827 P.2d 591 (Colo.App.1992) (noting that the required necessity is the necessity for the easement at the time of severance, not at the time of the court hearing).

Accordingly, to imply an easement by prior use, the landowners here would have had to show that the mountain property was being used *by Beaubien* at the time of the conveyance of the vara strips as a necessary adjunct in order to support the viability of the vara strips. Only by that means could the landowners demonstrate that Beaubien necessarily intended to grant to them such rights. The evidence does not suggest that Beaubien was then making use of the property nor that Taylor Ranch was necessary to the community. Rather, the evidence demonstrates that no one lived on the property at the time of the grants, and that the grazing, timber, and firewood use occurred on property other than the Taylor Ranch. Under those circumstances, an easement by necessity cannot exist.

## V. Conclusion

I do not believe that the landowners here have established their right to use the Taylor Ranch lands as they claim. They cannot, in my view, rely upon the Beaubien Document because it did not comply with the laws in effect at the time of its execution by failing to identify specific grantees. The document was not ambiguous, and therefore cannot support rights by implication. Further, none of the theories for implication of an easement apply to these facts.

Accordingly, I would affirm the court of appeals and thus respectfully dissent from the majority opinion.

I am authorized to state that Justice RICE joins in this dissent.

